James T. GRIGSBY, Appellee,

v.

James MABRY, Commissioner, Arkansas Department of Correction, Appellant.

Ardia V. McCREE, Appellee,

v.

Vernon HOUSEWRIGHT, Director, Arkansas Department of Correction, Appellant.

No. 83–2113.

United States Court of Appeals, Eighth Circuit.

Submitted March 15, 1984.

Decided Jan. 30, 1985.

As Corrected March 18, 1985.

Victra L. Fewell, Asst. Atty. Gen., Little Rock, Ark., for appellant.

John Charles Boger, New York City, for appellee.

Before LAY, Chief Judge, and HEANEY, BRIGHT, ROSS, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG and BOWMAN, Circuit Judges.

LAY, Chief Judge.

The issues on this appeal relate to the question left open in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968): whether the exclusion of jurors who hold absolute scruples against the death penalty creates a "conviction-prone" jury as to the guilt of a defendant in a capital case.[1] On an earlier remand from this court, *Grigsby v. Mabry*, 637 F.2d 525 (8th Cir.1980), modifying 483 F.Supp. 1372 (E.D.Ark.1980), the district court held a plenary hearing on the issues involved: (1) whether the sixth amendment right to a trial by jury is violated in capital cases by a jury from which the state has systematically excluded at *voir dire* all persons who hold inflexible scruples against capital punishment and (2) whether exclusion of the *Witherspoon* excludables (WEs)[2] during the guilt-innocence phase of the trial violates a defendant's fourteenth amendment due process right to a fair and impartial jury. The trial court, the Honorable G. Thomas Eisele, in a learned and exhaustive opinion, found that both the sixth amendment right to have a jury selected from a representative cross section of the community, and the fourteenth amendment due process right to have an impartial jury, were violated. As a result, the trial court ordered that the state of Arkansas, in all capital cases, must hold bifurcated jury trials; first, as to guilt, and second, assuming guilt, as to punishment. *Grigsby v. Mabry*, 569 F.Supp. 1273, 1321–

---

1. The Supreme Court stated:

    The data adduced by the petitioner, however, are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. In light of the presently available information, we are not prepared to announce a *per se* constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was.

    \*       \*       \*       \*       \*       \*

    Even so, a defendant convicted by such a jury in some future case might still attempt to establish that the jury was less than neutral with respect to *guilt.* If he were to succeed in

that effort, the question would then arise whether the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a completely fair determination of guilt or innocence—given the possibility of accommodating both interests by means of a bifurcated trial, using one jury to decide guilt and another to fix punishment. That problem is not presented here, however, and we intimate no view as to its proper resolution.

    *Witherspoon*, 391 U.S. at 517–518, 520 n. 18, 88 S.Ct. at 1774–1775, 1776 n. 18 (emphasis original).

2. "*Witherspoon* excludables" are those venirepersons "who say that they could never vote to impose the death penalty or that they would refuse even to consider its imposition in the case before them." *Witherspoon*, 391 U.S. at 514, 88 S.Ct. at 1772.

23 (E.D.Ark.1983). Stay granted 583 F.Supp. 629 (E.D.Ark.1983).

■ Based on the overall exhaustive record, we find substantial evidentiary support for the district court's findings. We find that substantial evidence supports the court's finding that a capital jury, with WEs stricken for cause, is in fact conviction prone and, therefore, does not constitute a cross-sectional representation in a given community. In view of our finding on the sixth amendment violation, it is unnecessary to discuss the issue whether the jury in the petitioners' cases was in fact a biased jury. We affirm, with modification, the judgment of the district court. We vacate that portion of the district court's judgment which requires the state to utilize two separate juries; one to determine guilt-innocence and another for the penalty phase of the trial. We leave the actual procedural remedy to the discretion of the state.

Although this was originally a consolidated proceeding,[3] the district court granted a writ of habeas corpus only to the petitioner Ardia McCree. McCree was convicted of capital murder in Ouachita County, Arkansas in 1978. He is presently serving a life sentence without parole. His conviction was affirmed by the Arkansas Supreme Court. *See McCree v. State*, 266 Ark. 465, 585 S.W.2d 938 (1979). In McCree's trial, eight prospective jurors were excused for cause on the ground that they could not impose the death penalty. McCree made a timely objection to the exclusion of WEs in the guilt-innocence phase. Moreover, in the present case, the state expressly has waived any claim of exhaustion of remedies or other procedural bar.[4]

**I.**

In *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979), the Supreme Court stated:

In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

And in an earlier opinion, *Taylor v. Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690 (1975), the Court stated:

[T]he jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.

A threshold contention of the state here is that the cross-sectional requirement of the sixth amendment is not applicable to a petit jury. In making this argument the state relies on statements taken from *Duren* that such attack only applies to the panels or venires from which juries are drawn. *Duren,* 439 U.S. at 363–64, 99 S.Ct. at 668. Similarly, the state cites from *Taylor* the abstraction that "we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Taylor,* 419 U.S. at 538, 95 S.Ct.

---

**3.** McCree's habeas corpus petition was consolidated with two other petitions, by James Grigsby and DeWayne Hulsey. Grigsby died in his cell in June 1983 and his case is now moot. Hulsey's case was held to be procedurally barred under the rule of *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), since he made no contemporaneous objection to the exclusion for cause of death-scrupled venirepersons. *Grigsby v. Mabry,* 569 F.Supp. 1273, 1276 (E.D.Ark.1983).

**4.** The state, citing *Pickens v. Lockhart,* 714 F.2d 1455 (8th Cir.1983), does argue that McCree was not prejudiced because the evidentiary trial record amply supports a finding of guilt. The prejudice test applied in *Pickens* was related to the failure of Pickens to assert a contemporaneous objection at trial. *See Pickens,* 714 F.2d at 1458 n. 2. In *Pickens,* the *Wainwright* rule governed. Here the state has waived any procedural bar and, therefore, at least under the sixth amendment claim, as we discuss, we need not evaluate the issue of prejudice.

at 702. The state also argues that this court rejected a sixth amendment attack on a petit jury in *United States v. Childress*, 715 F.2d 1313 (8th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984).[5]

■■■■ *Childress* must be read within its factual context. The significant issue in *Childress* was whether an alleged systematic exclusion of blacks by the prosecution in exercising its peremptory strikes constituted a sixth amendment violation. *Childress*, 715 F.2d at 1314–15. We agree the state may exercise peremptory challenges as it deems necessary. *See Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *but see Williams v. Illinois*, —— U.S. ——, 104 S.Ct. 2364, 80 L.Ed.2d 836 (1984) (Marshall, J., dissenting); *Gilliard v. Mississippi*, —— U.S. ——, 104 S.Ct. 40, 78 L.Ed.2d 179 (1983) (Marshall, J., dissenting). No stated reason is necessary in exercising peremptory challenges. To establish a rule that jurors cannot be stricken by peremptory challenges on certain grounds seeks the impossible and limits the right of a party to eliminate jurors who appear to be biased. A correlative to *Childress* is the concept that no defendant has the right to select biased jurors who he feels might be more sympathetic to his case.

■■■ It would, of course, be impossible to obtain a petit jury that reflects all the distinctive groups in a community.[6] In this sense it is easy to conclude that systematic exclusion, as it relates to the necessity of having a cross-sectional jury, is generally not an issue when dealing with the petit jury. Nevertheless, in given factual instances, the sixth amendment requirement of cross-sectional representation has been held applicable to the petit jury. *See Adams v. Texas*, 448 U.S. 38, 50, 100 S.Ct. 2521, 2529, 65 L.Ed.2d 581 (1980); *Ballew v. Georgia*, 435 U.S. 223, 236–37, 98 S.Ct. 1029, 1037–38, 55 L.Ed.2d 234 (1978); *Witherspoon*, 391 U.S. at 518–23, 88 S.Ct. at 1775–78. There is no justifiable reason to conclude that a statute which systematically eliminates distinct groups of citizens from sitting on a petit jury would not violate the sixth amendment requirement of a representative cross-sectional jury.[7] We deal here with a right to eliminate *for cause* a distinctive group of prospective jurors. If prospective jurors, who would take an oath to decide a case on the basis of the law and facts presented, could be excluded for cause because they were white or black, or, based on questions elicited on *voir dire*, because they were pro-ERA, pro-life, Republicans or Democrats, such a systematic exclusion from the panel, would encroach upon a party's sixth amendment right to have a cross-sectional jury.

We base our rejection of the state's argument on decisions of the Supreme Court. In *Swain* the Court noted that systematic exclusion from a petit jury of a distinctive group over a long period of time would be wrong. *Swain*, 380 U.S. at 223–24, 85 S.Ct. at 837–38. In *Ballew v. Georgia*, 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978), the Court held that a petit jury of less than six persons would violate a defendant's sixth amendment right to have a cross-sectional representation. *Id.* at 230, 245, 98 S.Ct. at 1034, 1041. *See also Wil-*

---

5. We stated in *Childress*:
    The extension of *Taylor v. Louisiana* from the venire to the petit jury has much logical and practical appeal. * * * However, the Supreme Court in *Taylor* expressly limited the fair cross section of the community holding to the venire, not the petit jury.
    *Childress*, 715 F.2d at 1319–20.

6. Any implication by the dissent suggesting the majority requires representation of all cognizable groups on each petit jury is misplaced. *See infra* pp. 244, 245–246. Our holding simply forbids the systematic exclusion of any cognizable group from a petit jury.

7. There is no functional difference between excluding a particular group of eligible citizens from the "jury wheels, pools of names, panels or venires from which juries are drawn" and systematically excluding them from sitting on a petit jury. *Duren* and *Taylor* forbid the former explicitly and can be read to forbid the latter implicitly. *Duren*, 439 U.S. at 363–67, 99 S.Ct. at 668–70; *Taylor*, 419 U.S. at 526–31, 95 S.Ct. at 695–98. The result is the same in either case: a distinct group of the citizenry is prevented from being considered for service on petit juries.

liams v. Florida, 399 U.S. 78, 100–01, 90 S.Ct. 1893, 1905–06, 26 L.Ed.2d 446 (1970). And finally, *Witherspoon* itself is direct authority that a distinctive group, eliminated for cause from the petit jury, violates the sixth amendment principle that requires a cross-sectional jury. As Justice Stewart noted, in response to the argument that no actual prejudice had been shown: "But it is self-evident that, in its role as arbiter of the punishment to be imposed, this jury fell woefully short of that impartiality to which the petitioner was entitled under the *Sixth* and Fourteenth Amendments." *Witherspoon*, 391 U.S. at 518, 88 S.Ct. at 1775 (our emphasis). The Court went on to state:

> Guided by neither rule nor standard, "free to select or reject as it [sees] fit," a jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death. Yet, in a nation less than half of whose people believe in the death penalty, *a jury composed exclusively of such people cannot speak for the community.* Culled of all who harbor doubts about the wisdom of capital punishment—of all who would be reluctant to pronounce the extreme penalty—such a jury can speak only for a distinct and dwindling minority.
>
> \*    \*    \*    \*    \*    \*
>
> Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples

against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected.

*Witherspoon*, 391 U.S. at 519–20, 521–23, 88 S.Ct. at 1775–76, 1777 (footnotes omitted) (our emphasis).

■ We conclude on the facts of the present case, which involves a challenge for cause, that the state cannot defeat a sixth amendment claim on the ground that we deal only with a petit jury, rather than the jury pool at large.

## II.

Turning to the specific elements of the *Duren* test, we find *Witherspoon* also is direct authority that the group of WEs excluded in this case is a distinctive group in the community. *Witherspoon* found a distinctive group in those venirepersons who were not "automatic-life"[8] but still had scruples against the death penalty. The district court found "that the [*Witherspoon* excludable] group is of substantial size both nationally and within the state of Arkansas, ranging between 11% and 17% of those eligible for jury service. So the group excluded is both distinct and sizeable."[9] *Grigsby*, 569 F.Supp. at 1285.

The second element of the *Duren* test relates to venires. However, given our earlier discussion and finding that there is no practical difference between exclusion from the venire and systematic exclusion for cause from the petit jury, we analyze the resultant petit juries. In this case we find the representation of WEs on the juries is not "fair and reasonable in relation to the number of such persons in the community \* \* \*." *Duren*, 439 U.S. at 364, 99 S.Ct. at 668. The district court found WEs constitute between eleven and seventeen

---

**8.** "Automatic-life" venirepersons are those who, due to their personal objections to the death penalty, would always vote for a life sentence and refuse to consider ever imposing the death penalty. These are the persons *Witherspoon* allows to be excluded from the penalty phase of a capital trial—WEs.

**9.** The district court also found:

> Blacks and women constitute significant and distinctive groups of jury-eligible citizens within Arkansas and the Nation. Death quali-

fication results in their systematic disproportionate removal from juries which try the guilt-innocence of persons accused of capital crimes, without adequate justification, in violation of the accused's right to a representative jury comprised of a fair cross-section of the community.

*Grigsby*, 569 F.Supp. at 1294. Since we find that the exclusion of WEs violates the sixth amendment, we need not pass on the court's finding relating to blacks and women.

percent of the population. However, WEs are totally excluded from guilt-innocence juries in Arkansas.

Finally, *Duren* requires the petitioners to establish that the WEs are systematically excluded. Here, the district court found the systematic exclusion results from the *voir dire* at trial. *Grigsby*, 569 F.Supp. at 1286. There is little argument offered by the state that in capital cases the exclusion is not systematic.

## III.

It is necessary to emphasize that this case concerns only the exclusion of WEs from the guilt-innocence phase of a capital trial. The exclusion of jurors who will never consider a penalty of death, approved in *Witherspoon*, becomes irrelevant when the focus is on the first half of a bifurcated trial;[10] on the guilt-innocence phase, rather than the penalty determination. *Witherspoon* does not hold that jurors unalterably opposed to the death penalty, but who nonetheless can swear to consider the evidence and follow the law in determining guilt, can be excluded from the guilt-innocence phase of a bifurcated trial.[11]

The fundamental issue facing the court is whether the evidence supports the district court's finding that a jury with WEs stricken for cause is a conviction-prone jury. If the evidence supports this finding then we feel McCree has established his case that there has been a denial of his sixth amendment right. This conclusion finds analogous support in the *Witherspoon* court's holding that exclusion for cause of venirepersons who opposed the

death penalty, but were found not to be automatic-life—i.e., able to consider the evidence and follow the law—created "a tribunal organized to return a verdict of death." *Witherspoon*, 391 U.S. at 521, 88 S.Ct. at 1776. Since the district court has exhaustively analyzed this evidence, *see Grigsby*, 569 F.Supp. at 1291–1308, we need only summarize the proofs.

A. Attitudinal and Demographic Surveys

1. Bronson, *On the Conviction Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Veniremen*, 42 U.Colo.L.Rev. 1 (1970). (*Bronson-Colorado*).

The subjects of this study were 718 Colorado venirepersons. Interviews were done by trained students from the University of Colorado in 1968 and 1969. Each subject was asked whether they strongly favored, favored, opposed, or strongly opposed the death penalty. This was followed by five questions regarding attitudes on criminal justice issues. On each of the five questions the survey found the stronger the subjects' support for the death penalty, the stronger their support for positions most favorable to the prosecution.

2. Bronson, *Does the Exclusion of Scrupled Jurors in Capital Cases Make the Jury More Likely to Convict? Some Evidence from California*, 3 Woodrow Wilson L.J. 11 (1980). (*Bronson-California*).

Two studies similar to the *Bronson-Colorado* survey are grouped together in this

---

**10.** Arkansas allows a bifurcated trial by the same jury. Ark.Stat.Ann. § 41–1301(3) (1977).

**11.** The *Witherspoon* court held the state could remove:

those [venirepersons] who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*

*Witherspoon*, 391 U.S. at 522–23 n. 21, 88 S.Ct. at 1777 n. 21 (emphasis in original). This hold-

ing explicitly allows for venirepersons excludable in the penalty phase to be included on the jury determining guilt-innocence.

The state makes much of the argument that a WE participating in the guilt-innocence determination might vote to find a defendant not guilty simply to insure that the death sentence will not be imposed during the penalty phase. This argument has little merit because it overlooks the requirement that the WE must swear to consider the evidence and follow the law in determining guilt, otherwise the WE can be excluded for cause. *We cannot assume a juror who takes the oath will not abide by it.*

article. Trained students interviewed 755 Butte County, California, venirepersons regarding their position on the death penalty. Seven attitudinal questions, much like those used in *Bronson-Colorado*, followed. Once again a direct and significant correlation between death penalty beliefs and criminal justice attitudes was found.

The second survey involved interviews of 707 venirepersons from Los Angeles, Sacramento and Stockton, California. The results were consistent with the prior studies: the more strongly the subjects favored the death penalty, the more likely they were to endorse pro-prosecution positions.

3. Louis Harris & Associates, Inc., *Study No. 2016* (1971).

Harris randomly polled 2,068 adults throughout the United States in 1971. The respondents were asked about their attitudes on the death penalty and other criminal justice issues. The results parallel those of the *Bronson* surveys. In addition, Harris found more blacks than whites, and more women than men, would be excluded from jury service by death qualification.

4. Fitzgerald & Ellsworth, *Due Process vs. Crime Control: Death Qualification and Jury Attitudes*, 8 Law & Hum.Behav. 31 (1984). (*Fitzgerald-1979*).

The survey upon which this article is based was a sample of 811 jury eligible persons in Alameda County, California, in 1979. An independent professional polling organization, Field Research Corporation of San Francisco, drew the sample and interviewed the subjects. Respondents who could not be fair and impartial, i.e., nullifiers, were excluded. Of the remaining 717 subjects, over seventeen percent were found to be WEs. Questions regarding attitudes on criminal justice issues showed that death qualified respondents were more favorable to the prosecution than the WEs.

5. Precision Research, Inc., *Survey No. 1286* (1981). (*Precision Survey*).

This survey was conducted by an Arkansas polling organization in 1981. A sample of 407 adults in the state of Arkansas were asked the same questions used in *Fitzgerald-1979*. The survey found that approximately eleven percent of those who could be fair and impartial in determining guilt-innocence were WEs.

B. Conviction-Proneness Surveys

1. H. Zeisel, Some Data on Juror Attitudes Toward Capital Punishment (University of Chicago Monograph 1968). (*Zeisel*).

In 1954 and 1955 Zeisel questioned jurors who had served on felony juries in Brooklyn, New York, and Chicago, Illinois. The subjects were asked about the first ballot votes of their jury and whether they had scruples against the death penalty. The study controlled for the weight of evidence in each case and found jurors with conscientious scruples against the death penalty voted to acquit more often than jurors without such scruples.

2. W. Wilson, Belief in Capital Punishment and Jury Performance (1964) (unpublished). (*Wilson*).

This study presented 187 college students with written descriptions of five capital cases in 1964. Each student was asked whether he or she had scruples against the death penalty. They were then asked to assume that they were jurors in the five cases. The students without death penalty scruples voted for conviction more often than those with scruples.

3. Goldberg, *Toward Expansion of Witherspoon: Capital Scruples, Jury Bias, and Use of Psychological Data to Raise Presumptions in the Law*, 5 Harv.C.R.–C.L.L.Rev. 53 (1970).

A set of sixteen written descriptions were given to 100 white and 100 black college students in Georgia. Those without scruples voted to convict in seventy-

five percent of cases, compared to sixty-nine percent for those with scruples.

4. Jurow, *New Data on the Effect of a "Death Qualified" Jury on the Guilt Determination Process*, 84 Harv.L.Rev. 567 (1971). (*Jurow*).

Audio recordings of two simulated murder trials were played for 211 employees of Sperry Rand Corporation in New York. The subjects filled out questionnaires which measured their attitudes toward the death penalty and various criminal justice issues. The subjects were then asked to listen to each "trial" and vote on guilt-innocence. Those persons who more strongly favored the death penalty were found to be more likely to convict.

5. Cowan, Thompson & Ellsworth, *The Effects of Death Qualification on Jurors' Predisposition to Convict and on the Quality of Deliberation*, 8 Law & Hum.Behav. 53 (1984). (*Cowan-Deliberation*).

This 1979 study began by identifying the WEs in its sample of jury eligible residents of San Mateo and Santa Clara Counties, California. Those WEs who could not be fair and impartial in determining guilt-innocence (nullifiers) were excluded from the sample. The remaining 288 subjects were shown a realistic two and one-half hour videotape of a murder trial. The subjects filled out questionnaires regarding their criminal justice attitudes and were assigned to panels of twelve in order to simulate jury deliberations. Some panels were death qualified, while others included WEs. Ballot forms were filled out by each subject before and after the panel deliberations as a means of examining the quality and importance of the deliberations.

The study found that death penalty attitudes were closely linked to conviction proneness—subjects favoring the death penalty were more likely to convict. In addition, the study concluded that jury panels containing a mix of WEs and death-qualified subjects tended to view *all* witnesses more critically and remember the

facts of the case more accurately than death-qualified jury panels.

C. Other Surveys

1. Thompson, Cowan, Ellsworth & Harrington, *Death Penalty Attitudes and Conviction Proneness*, 8 Law & Hum.Behav. 95 (1984). (*Thompson-Attitudes*).

A videotape of two witnesses' conflicting testimony in a criminal trial was shown to twenty death-qualified subjects and sixteen WEs, all of whom had participated in the *Cowan-Deliberation* survey. The subjects then filled out a questionnaire regarding the testimony they had viewed. The death-qualified subjects gave answers more favorable to the prosecution than the WEs.

2. Haney, *On the Selection of Capital Juries: The Biasing Effects of the Death-Qualification Process*, 8 Law & Hum.Behav. 121 (1984).

This study investigated the process of death qualification on the jurors who undergo it. A sample of sixty-seven jury eligible residents of Santa Cruz County, California were selected after screening out those who could not be fair and impartial in determining guilt-innocence (nullifiers). The subjects were randomly divided into two groups and shown a realistic two hour videotape of a murder trial. One group, in addition, saw a half-hour of *voir dire* in which prospective jurors were death qualified. The study found that the members of the group which viewed the *voir dire* were more likely to believe the defendant was guilty than members of the other group.

3. A. Young, Arkansas Archival Study (1981) (unpublished). (*Arkansas Study*).

This study consisted of a review of forty-one transcripts of *voir dires* in capital cases from 1973 to 1981 which were on file at the Arkansas Supreme Court. The survey found that over fourteen percent of the

venirepersons were WEs and one-half of one percent were ADPs.[12]

D.  Expert Testimony [13]

1.  Edward J. Bronson, B.S., J.D., LL.M., Ph.D.

Dr. Bronson is a Professor of Public Law and Political Science at California State University at Chico. He has experience working with a variety of officials in the criminal justice system including prison officials, law enforcement officers, and parole officers. At trial, Dr. Bronson testified for petitioners about his own empirical evidence and evidence developed by others. He discussed how death qualification affects the attitudes and demographic composition of the resulting juries.

2.  Craig W. Haney, B.A., M.A., Ph.D., J.D.

Dr. Haney is a Professor of Psychology at the University of California, Santa Cruz. He has conducted research on a wide range of criminal justice subjects including plea bargaining, eye witness testimony, the effects of television on witness perception, the impact of imprisonment on personality and the effects of *voir dire* on prospective jurors. Dr. Haney's testimony for petitioners concerned the relationship between death penalty attitudes and other criminal justice attitudes. In addition, Dr. Haney presented his study on how death qualification *voir dire* tends to bias the resulting jury against the defendant.

3.  Reid Hastie, B.A., M.A., Ph.D.

Dr. Hastie is a Professor of Psychology at Northwestern University. He has focused his research on juries and their decision-making process. In his testimony for petitioners, Dr. Hastie reviewed research on the effect of death qualification on the resulting jury and the quality of that jury's deliberation and fact finding. He also compared the relative conviction proneness of death-qualified and nondeath-qualified juries.

4.  Gerald H. Shure, B.S., Ph.D.

Dr. Shure is a Professor of Psychology and Sociology at the University of California, Los Angeles. His research in the field of jury behavior is limited; however, Dr. Shure has considerable expertise in the effects of communication channels in problem solving, bargaining and negotiation, and pacifist behavior. Dr. Shure, in his testimony for the state, critiqued petitioners' studies and offered one of his own.[14]

E.  Discussion

After examining all of the surveys and considering extensive testimony, the district court concluded that petitioners had proven a jury with WEs stricken for cause is a conviction-prone jury. *Grigsby*, 569 F.Supp. at 1293–1305. The district court found that "[a]lthough Dr. Shure has made some reasonable criticisms and suggestions concerning the possibility of improving research techniques and better interpretation of existing studies, he has not, in his general comments, successfully impeached the clear thrust and effect of petitioner's [sic] case." *Grigsby*, 569 F.Supp. at 1307. Dr. Shure's own study did not contradict the basic findings introduced by petitioners and he acknowledged there were problems with

---

12.  "ADPs" (Automatic Death Penalty) are venirepersons who would always vote for imposition of the death penalty when a capital defendant has been found guilty.

13.  Other witnesses beyond the four summarized here testified at the hearing. However, the district court relied most heavily on the testimony of these four witnesses in reaching its conclusions. Thus, we find it unnecessary to discuss the other testimony, most of which merely duplicated or reinforced that of Doctors Bronson, Haney, Hastie, and Shure.

14.  Arkansas also used Dr. Shure to introduce the "automatic death penalty" (ADP) issue. ADP jurors are at the opposite end of the spectrum from WEs. The state argued that the court should consider the effect of eliminating ADPs, as well as WEs, when considering the conviction proneness of a death-qualified jury. The district court was not sure the ADP issue was properly before it, *Grigsby*, 569 F.Supp. at 1305, but found the group constituted between one and two percent of the general population, *id.* at 1307–08, and concluded the effect of their inclusion or exclusion was negligible, *id.* at 1308.

his results. *Id.* at 1307–08. Indeed, the district court found "[i]n many ways his testimony reinforces that of the petitioners' experts." *Id.* at 1307. Judge Eisele was impressed with the consistency of all evidence in supporting the conclusion that death-qualified juries are conviction prone. *Id.* at 1307, 1322–23.

On appeal, the state challenges petitioners' evidence on many grounds: (1) petitioners compared the wrong groups—WEs versus death-qualified jurors instead of WEs and ADPs versus death-qualified jurors; (2) petitioners succeeded in showing only that WEs are biased because they are more acquittal prone than death qualified jurors; and (3) the behavior of jurors cannot be predicted on the basis of the studies and testimony presented. Moreover, Arkansas complains that much of the evidence was based on statistical significance, which the state calls "the lowest form of proof."

Arkansas' first argument is based on the fact that some of the early studies do not identify WEs or properly differentiate between WEs and death-qualified jurors. In addition, the state contends petitioners have failed to account for ADPs. Of course the pre-*Witherspoon* studies did not specifically identify WEs, nonetheless they do show that death penalty attitudes are directly related to general criminal justice attitudes and conviction proneness.[15] The later studies identified WEs properly and their results were consistent with the earlier ones.[16] Later studies also identified ADPs and found them to be a negligible group.[17] For this reason we are not limited in our conclusions the way the California Supreme Court was in *Hovey v. Superior Court*, 28 Cal.3d 1, 63–64, 616 P.2d 1301, 1343–44, 168 Cal.Rptr. 128, 170–71 (1980).[18]

The focus on particular groups of jurors does give insight into the difference between a death-qualified jury and a normal criminal jury. The state argues that the comparison should center on the two types of juries rather than the characteristics of WEs and death-qualified jurors. However, by examining and defining the elements of the normal criminal jury which are missing on a death-qualified jury—the WEs and ADPs—reasonable conclusions about the differences between the two juries can be drawn. In addition, one study did compare death-qualified with nondeath-qualified panels.[19]

■■■■ Arkansas next echoes the Fifth Circuit's argument[20] that the only thing the evidence shows is WEs are acquittal prone. The state contends petitioners have not proved death-qualified juries are necessarily biased. First, we must note the systematic exclusion of any distinct qualified group from jury service violates the cross-sectional requirement of the sixth amendment whatever the bias of that group. As we discussed previously, WEs who can follow the law and fairly try guilt-innocence are a distinct qualified group. Second, the state ignores its own previous argument

15. *See Bronson-Colorado; Jurow; Wilson; Zeisel;* Louis Harris & Associates, Inc., *Study No. 2016* (1971).

16. *See Cowan-Deliberation; Fitzgerald-1979; Thompson-Attitudes; Precision Survey.*

17. *See Jurow; Arkansas Study;* Louis Harris & Associates, Inc., *Study No. 814002* (1981). Dr. Shure's own survey identified 33% ADPs, but he admitted this figure was "off the map" and stated: "I just can't believe the number of ADPs here * * * I do believe our figures are inflated and I don't understand why." *Grigsby,* 569 F.Supp. at 1307–08. The district court considered all the evidence and concluded "the number of those who would automatically vote for the death penalty in Arkansas and nation-

wide is negligible when compared to the number of those who would never under any circumstances vote for the death penalty." *Id.* at 1308.

18. In *Hovey* no evidence was presented regarding the size of the ADP group nor the effect of excluding them, as well as WEs, from the petit jury.

19. *See Cowan-Deliberation.*

20. *See Smith v. Balkcom,* 660 F.2d 573, 579 (5th Cir.1981), *modified,* 671 F.2d 858 (5th Cir.), *cert. denied,* 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982); *Spinkellink v. Wainwright,* 578 F.2d 582, 593–94 (5th Cir.1978), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979).

that the proper comparison is not between WEs and death-qualified jurors but, instead, between a normal criminal jury and a death-qualified jury. The evidence presented by petitioners amply supports the district court's finding that death-qualified juries are more conviction prone than a normal criminal jury.

Arkansas also contends that the behavior of real jurors cannot be predicted from the studies presented by petitioners. However, some of the studies included real jurors,[21] and one involved a realistic simulation of jury deliberations.[22] The state of California raised the same objection in *Hovey* and it was flatly rejected. *Hovey*, 28 Cal.3d at 61–62, 616 P.2d at 1342, 168 Cal. Rptr. at 169. Furthermore, it is the courts who have often stood in the way of surveys involving real jurors[23] and we should not now reject a study because of this deficiency.

Finally, Arkansas complains about the court's reliance on social science data and belittles its statistical significance. Other courts have accepted some of the studies presented here and similar social science data. *See Keeten v. Garrison*, 578 F.Supp. 1164, 1171–77 (W.D.N.C.), *rev'd*, 742 F.2d 129 (4th Cir.1984); *Hovey*, 28 Cal.3d at 26–60, 616 P.2d at 1314–41, 168 Cal.Rptr. at 141–68. Moreover, in *Witherspoon*, the Supreme Court invited development of this type of evidence. *Witherspoon*, 391 U.S. at 517, 520 n. 18, 88 S.Ct. at 1774, 1776 n. 18. In other sixth amendment cases the Supreme Court has relied on similar data. *See Ballew v. Georgia*, 435 U.S. 223, 232–39, 98 S.Ct. 1029, 1035–39, 55 L.Ed.2d 234 (1978); *Colgrove v. Battin*, 413 U.S. 149, 158–60, 93 S.Ct. 2448, 2453–54, 37 L.Ed.2d 522 (1973); *Williams v. Florida*, 399 U.S. 78, 101–02, 90 S.Ct. 1893, 1906–07, 26 L.Ed.2d 446 (1970). All of the studies introduced were consistent in their conclusions that death penalty attitudes are related to criminal justice attitudes and conviction proneness. Arkansas introduced no contrary studies. The consistency over a wide range of survey methods and respondents is impressive. The state's attack is not well founded. The district court's finding of fact that a petit jury without WEs is "conviction prone" and, therefore, not an impartial or cross-representative jury is not clearly erroneous.

The state raises two additional issues which merit discussion. First, the question is raised whether or not those who are not WEs, but still possess scruples against the death penalty, will adequately represent WEs on the jury so as to nullify the argument that the jury is conviction prone or not cross-representative. The second question is whether the fact that ADPs are excluded from the jury in Arkansas undermines the studies relied upon by the district court. *Cf. Hovey*, 28 Cal.3d at 63–69, 616 P.2d at 1343–47, 168 Cal.Rptr. at 170–74.

■ The district court rejected both arguments. We agree with its conclusions. In considering the first argument, the court addressed our holding in *United States v. Olson*, 473 F.2d 686 (8th Cir.), *cert. denied*, 412 U.S. 905, 93 S.Ct. 2291, 36 L.Ed.2d 970 (1973), and found there was no evidence in that case to suggest that the criminal justice attitudes of the excluded eighteen to twenty year old group would not be represented by other eligible jurors. *Grigsby*, 569 F.Supp. at 1282–83. By contrast, in this case, the district court found that one element of the WEs' distinctiveness as a group is that no other group of death-qualified jurors shared their attitudes or perspectives. *Id.* at 1283. The court considered petitioners' attitudinal studies and concluded: "[s]uch evidence undercuts the idea that the mildly scrupled jurors who are not excluded under *Witherspoon* would adequately represent the attitudes of those who are excluded under *Witherspoon*." *Id.*

---

**21.** *See Bronson-California; Bronson-Colorado; Zeisel.*

**22.** *See Cowan-Deliberation.*

**23.** *See Jurow* at 576–77.

Turning to the second argument, the district court noted "the State, by embracing the ADP issue, has effectively conceded the validity of the a priori, intuitive, gut feelings of all who actively and routinely participate in jury cases in nisi prius courts—the 'fireside induction'—that WEs are acquittal prone and ADPs are conviction prone." *Id.* at 1306. The court also pointed out that the present case can be distinguished from *Hovey* because "the Court in *Hovey*, like the United States Supreme Court in *Witherspoon*, did not feel that it had adequate empirical data before it to permit it to deal with the important constitutional issues at stake."[24] *Id.* In this case the ADP issue was squarely addressed and both expert testimony and an empirical study were introduced by the state. The district court found that neither significantly undermined the studies presented by petitioners. *Id.* at 1307–08. Furthermore, Arkansas' expert admitted there were basic deficiencies in his survey. *Id.* The court concluded the number of ADPs was negligible and found that their removal from a death-qualified jury "contributes only to the appearances of fairness." [25] *Id.* at 1308.

24. *See Hovey*, 28 Cal.3d at 64–65, 616 P.2d at 1343–44, 168 Cal.Rptr. at 170–71.

25. The ADP issue was raised in *Adams v. Texas*, 448 U.S. 38, 49, 100 S.Ct. 2521, 2528, 65 L.Ed.2d 581 (1980), and the Supreme Court found it insubstantial.

26. 28 Cal.3d 1, 616 P.2d 1301, 168 Cal.Rptr. 128 (1980). The California Supreme Court considered Hovey's claims that (1) his death-qualified jury was not neutral, but, rather, conviction prone; and (2) the *voir dire* procedure tends to make the resulting jury less neutral and more conviction prone. On the first issue, the court accepted and considered some of the same studies presented in this case. *Id.* at 26–60, 616 P.2d at 1314–41, 168 Cal.Rptr. at 141–68. It noted that Hovey failed to account for ADPs and presented no evidence regarding the size of this group. *Id.* at 64, 616 P.2d at 1344, 168 Cal.Rptr. at 171. Furthermore, the court stated that Hovey failed to show the exclusion of WEs resulted in the exclusion of any particular attitudes or perspectives from the jury. *Id.* at 68, 616 P.2d at 1346, 168 Cal.Rptr. at 173. Thus, the court concluded that Hovey failed to prove a California death qualified jury was not neutral. The court stated: "Therefore, until further research

In upholding the district court's finding based upon the evidentiary record we must note: (1) the record here is exhaustive; it is difficult to perceive how any petitioner could make a record and an objection to death-qualified juries, as constituting an improper jury for the determination of guilt-innocence, more complete than that presented here; and (2) there are no studies which contradict the studies submitted; in other words, all of the documented studies support the district court's findings.

## IV.

■ Only a few cases have been decided with a similar question. We note *Hovey* in California,[26] the Fifth Circuit cases of *Smith v. Balkcom*, 660 F.2d 573 (5th Cir. 1981), *modified*, 671 F.2d 858 (5th Cir.), *cert. denied*, 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982), and *Spinkellink v. Wainwright*, 578 F.2d 582 (5th Cir.1978), *cert. denied*, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979), and the well-written opinion of Judge McMillan of the district court in North Carolina, *Keeten v. Garrison*, 578 F.Supp. 1164 (W.D.N.C.), *rev'd*, 742 F.2d 129 (4th Cir.1984). We are very much aware that our affirmance of the

is done which makes it possible to draw reliable conclusions about the nonneutrality of 'California death-qualified' juries in California, this court does not have a sufficient evidentiary basis on which to bottom a constitutional holding under *Witherspoon* and *Ballew*." *Id.*, 616 P.2d at 1346, 168 Cal.Rptr. at 173–74. In the present case, petitioners have shown that ADPs constitute between one and two percent of the population. *Grigsby*, 569 F.Supp. at 1307–08. Petitioners have also shown that the attitudes and perspectives of WEs are not represented by any other group of eligible jurors and are, thus, excluded from death-qualified juries. *Id.* at 1283.

Addressing Hovey's second contention, the California Supreme Court concluded that *voir dire* for death qualification does tend to bias the resulting jury against the defendant and make it conviction prone. *Hovey*, 28 Cal.3d at 70–73, 616 P.2d at 1347–50, 168 Cal.Rptr. at 174–77. Thus, the court held that individualized sequestered *voir dire* should be required in order to "minimize the untoward effects of death-qualification * * *." *Id.* at 80, 616 P.2d at 1353, 168 Cal.Rptr. at 181.

district court here creates a conflict among circuits; this is an important issue since the decision relates to hundreds of prisoners now on death row. We are hopeful the Supreme Court will grant a writ of certiorari and resolve the issue.[27] However, in

**27.** The state of Arkansas has argued our holding today would be contrary to recent Supreme Court decisions. In its reply brief, Arkansas directed our attention to four particular cases, in addition to *Witherspoon*. It has also argued that *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), supports the state's position. As we discussed previously, *Witherspoon* did not decide the issues presented in this case. On the contrary, *Witherspoon* explicitly left these issues open. *Witherspoon*, 391 U.S. at 517–18, 520 n. 18, 88 S.Ct. at 1774–75, 1776 n. 18. We have examined the other cases cited by Arkansas and conclude that none of them resolve the important sixth amendment issue we address today.

Arkansas asserts *Adams* held, *sub silentio*, that WEs can be excluded from the guilt-innocence phase as well as the penalty determination. There is no language in the opinion which supports this contention. The Court focused on the penalty questions which, under Texas law, the jury must answer affirmatively in order to sentence a defendant to death. *Adams*, 448 U.S. at 40–41, 46, 50, 100 S.Ct. at 2524–25, 2526, 2529. The Court gave no indication it was addressing or deciding the issue *Witherspoon* had expressly left open. *Adams* does support the proposition that a state may exclude jurors who will not abide by their oath. *Id.* at 44, 46, 50, 100 S.Ct. at 2526, 2527, 2529. However, that is not an issue in the present case. We agree, and petitioners do not dispute, that Arkansas may exclude jurors who will not take the oath and decide guilt-innocence on the basis of the law and evidence presented. But the state cannot assume a juror with scruples regarding the death penalty will violate the oath and refuse to follow the law. *Adams* holds that the state cannot exclude venirepersons simply because their attitudes toward the death penalty may affect their deliberations on issues of fact. *Id.* at 46–47, 49–51, 100 S.Ct. at 2526–27, 2528–29.

*Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), is entirely consistent with our holding today. In that case the trial judge "asked whether any of the prospective jurors were so opposed to capital punishment that 'they could not sit, listen to the evidence, listen to the law, (and) make their determination solely upon the evidence and the law without considering the fact that capital punishment' might be imposed." *Id.* at 595, 98 S.Ct. at 2960. Four venirepersons indicated they could not. The judge then asked each of the four whether they could take the oath "to well and truely [sic] try this case ... and follow the law * * *." *Id.* On two occasions, each of the four explicitly stated he or she could not take the oath. *Id.* at 596, 98 S.Ct. at 2960. The Supreme Court concluded:

> Each of the excluded veniremen in this case made it "unmistakably clear" that they could not be trusted to "abide by existing law" and "to follow conscientiously the instructions" of the trial judge. * * * They were thus properly excluded under *Witherspoon*, even assuming, *arguendo*, that *Witherspoon* provides a basis for attacking the conviction as well as the sentence in a capital case.

*Id.* (citation omitted). Of course, the Court had to "assume *arguendo*" that *Witherspoon* allowed an attack on the conviction because *Witherspoon* explicitly did not decide that issue.

In *Maggio v. Williams*, 464 U.S. 46, 104 S.Ct. 311, 78 L.Ed.2d 43 (1983), the Court vacated the stay of Williams' execution because it was based on his second petition for a writ of habeas corpus which the district court found "frivolous and without merit." *Id.* 104 S.Ct. at 312. The Fifth Circuit had affirmed the district court's denial of the petition. In passing, the Supreme Court commented on Williams' sixth and fourteenth amendment claims, finding "the evidence proffered by Williams on the question whether the jury was less than neutral with respect to guilt [was] tentative and fragmentary, and we cannot conclude that [the district court] abused its discretion in refusing to hold an evidentiary hearing on this issue." *Id.* 104 S.Ct. at 314. It is important to note that the Court did not indicate the issue itself lacked merit, but only that Williams' claim had no merit. In fact, two justices explicitly indicated that the issues raised in *Grigsby* do have merit. *Id.* 104 S.Ct. at 321 n. 7 (Brennan, J., dissenting). *See also Rector v. Arkansas*, —— U.S. ——, 104 S.Ct. 2370, 80 L.Ed.2d 842 (1984) (Marshall, J., dissenting); *Woodard v. Hutchins*, 464 U.S. 377, 104 S.Ct. 752, 754–55, 78 L.Ed.2d 541 (1984) (Brennan, J., dissenting); *Knighton v. Maggio*, —— U.S. ——, 105 S.Ct. 32, 82 L.Ed.2d 923 (1984) (Brennan, J., dissenting). In the instant case the evidence presented was neither tentative nor fragmentary and we conclude that venirepersons were excluded on a broader basis than required by *Witherspoon*.

*Sullivan v. Wainwright*, 464 U.S. 109, 104 S.Ct. 450, 78 L.Ed.2d 210 (1983), also involved a second petition for a writ of habeas corpus which was denied by the district court and affirmed by the Eleventh Circuit. The case reflects the Supreme Court's general policy of avoiding multiple reviews of successive writs of habeas corpus in capital cases, rather than the Court's considered judgment on the merits of the sixth amendment claim we address today. *Id.* 104 S.Ct. at 452. The Court did state Sullivan's claim that the jury was biased in favor of the prosecution was found meritless, but the implication is not that *Witherspoon* precluded the claim; rather, it appears no evidence ever was presented to substantiate the merits of Sullivan's claim. *Id.* 104 S.Ct. at 451.

doing so, it is our hope that the Supreme Court will agree with this court that the record is no longer fragmentary and now presents the issue with proofs adequate for review.

Nonetheless, although we are not fully cognizant of the records presented in *Spinkellink* and *Keeten,* in all due respect, we cannot follow the reasoning of our sister circuits. First, and foremost, it would appear that *Spinkellink,* without an evidentiary record, concluded as a matter of law that there can be no constitutional violation.[28] *See Spinkellink,* 578 F.2d at 593–98. As we will discuss, we disagree and feel this approach forecloses the invitation within *Witherspoon* that a litigant "in some future case might still attempt to establish that the jury was less than neutral with respect to *guilt." Witherspoon,* 391 U.S. at 520 n. 18, 88 S.Ct. at 1776 n. 18 (emphasis original). The reasoning of *Spinkellink,* however, was adopted by the Fourth Circuit in *Keeten,* despite the fact that the court had before it an evidentiary record somewhat modeled after the trial here. *See Keeten,* 742 F.2d at 133–34.

We feel the reasoning of *Spinkellink* and *Keeten* fails to analyze or decide the fundamental issue. In *Spinkellink* the court observed:

> *Woodard v. Hutchins,* 464 U.S. 377, 104 S.Ct. 752, 78 L.Ed.2d 541 (1984), is very similar to *Sullivan.* Once again the Court was faced with successive writs of habeas corpus and multiple reviews in a capital case and the Court acted quickly to vacate the stay of execution. *Id.* 104 S.Ct. at 752–53. Two justices expressed their view that petitioners must show actual bias on their particular juries to make out a claim of non-neutrality. *Id.* 104 S.Ct. at 754 (Rehnquist, J., concurring). However, another justice indicated that the claims raised in *Grigsby* have merit. *Id.* 104 S.Ct. at 754–55 (Brennan, J., dissenting). Justice Marshall, as noted previously, has expressed a similar view. *See Rector,* 104 S.Ct. at 2370 (Marshall, J., dissenting).

**28.** In *Witherspoon,* the Supreme Court addressed the sixth amendment issue of whether the death-qualified jury is cross representative as a question of fact, rather than law, and refused to resolve it on the basis of the "tentative and fragmentary" evidence before the Court. *Witherspoon,* 391 U.S. at 517–18, 88 S.Ct. at 1774–75. *See also, Maggio v. Williams,* 464 U.S. 46, 104 S.Ct. 311, 314, 78 L.Ed.2d 43 (1983). The Supreme Court also treated the sixth amendment

The petitioner complains of jury partiality. He alleges that the * * * "death-qualified" jury that [tried him] was "prosecution-prone." From this he concludes, by implication, that a nondeath-qualified jury * * * would be impartial with respect to the question of guilt or innocence. This is not necessarily so. When the petitioner asserts that a death-qualified jury is prosecution-prone, he means that a death-qualified jury is more likely to convict than a nondeath-qualified jury. Proof that this proposition is true is far from conclusive, but for the moment we will assume its validity. Even if it is true, the petitioner's contention still must fail. That a death-qualified jury is more likely to convict than a nondeath-qualified jury does not demonstrate which jury is impartial. It indicates only that a death-qualified jury might favor the prosecution and that a nondeath-qualified jury might favor the defendant.

*Spinkellink,* 578 F.2d at 593–94 (footnotes omitted).

We think this not only closes the door, as a matter of law, for a petitioner to present an empirical record to the contrary, but also fails to understand the fundamental issue.[29]

issue raised in *Ballew* as a question of fact. *Ballew,* 435 U.S. at 231–39, 98 S.Ct. at 1034–39.

Similarly, the California Supreme Court recognized the question whether the exclusion of WEs from the guilt-innocence phase of a capital trial violates the defendant's sixth amendment right is a question of fact, not law. *Hovey,* 28 Cal.3d at 26–60, 616 P.2d at 1314–41, 168 Cal. Rptr. at 141–68.

**29.** In a recent article, Professor Samuel Gross, one of petitioners' counsel, noted:

> If the prosecutor had not asked for the death penalty, Spinkellink would not have been tried by a death-qualified jury; did the Fifth Circuit really mean that the prosecutor is entitled to increase his chances of getting a conviction by putting the defendant's life at issue? The court tries to support its position by condemning non-death-qualified juries as "defendant-prone" [578 F.2d at 597], but the charge makes no sense: these are the very juries that try all non-capital crimes. Far from being biased, such juries, representing the entire range of community attitutdes [sic] and subject to no extraordinary selection procedures, are the yardstick by which the behav-

In adopting this reasoning, the *Keeten* court followed *Spinkellink* and added that "members of the venire who are irrevocably opposed to capital punishment would engage in jury nullification if permitted to sit at the guilt stage of a capital case and, therefore, would not be impartial fact finders." [30] *Keeten*, 742 F.2d at 133. And, in rejecting the due process claim, the court again followed *Spinkellink's* faulty reasoning:

> The fact that a death-qualified jury may be more conviction prone than one which

> ior of death-qualified juries must be measured.
> Gross, *Determining the Neutrality of Death-Qualified Juries: Judicial Appraisal of Empirical Data*, 8 Law & Hum. Behav. 7, 13 (1984).

**30.** This is what is termed the "nullifier" problem. However, petitioners do not claim such persons should be allowed to sit on juries and the *Keeten* court's observation is not a proper basis on which to ground its holding. Nullifiers are persons who refuse to follow the law and consider the evidence in the case. These persons would not take the oath to fairly and impartially try the case. If a juror takes the oath, the court cannot assume the juror will not follow it. The Fourth Circuit simply assumes that persons "irrevocably opposed to capital punishment" can never be fair or impartial in the determination of guilt.

**31.** The Fourth Circuit also relied on *Smith v. Balkcom*, 660 F.2d 573, 579 (5th Cir.1981), *modified*, 671 F.2d 858 (5th Cir.), *cert. denied*, 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982) which stated:

> The guarantee of impartiality cannot mean that the state has a right to present its case to the jury *most* likely to return a verdict of guilt, nor can it mean that the accused has a right to present his case to the jury *most* likely to acquit. But the converse is also true. The guarantee cannot mean that the state must present its case to the jury *least* likely to convict or impose the death penalty, nor that the defense must present its case to the jury *least* likely to find him innocent or vote for life imprisonment. * * * The logical converse of the proposition that death-qualified jurors are conviction prone is that nondeath-qualified jurors are acquittal prone, not that they are neutral.
> The problem is that the court focused on the wrong issue. The issue is not whether non-death-qualified jurors are acquittal prone or death-qualified jurors are conviction prone. The real issue is whether a death qualified *jury* is more prone to convict than the juries used in noncapital criminal cases—juries which include

includes jurors strongly opposed to the death penalty does not demonstrate which jury is impartial. Rather, "[i]t indicates only that a death-qualified jury might favor the prosecution and that a nondeath-qualified jury might favor the defendant." *Spinkellink v. Wainwright*, 578 F.2d at 594.

*Keeten*, 742 F.2d at 134.[31] This analysis misses the point. The issue is not whether a jury would be biased one way or the other, but whether an impartial jury can exist when a distinct group in the communi-

the full spectrum of attitudes and perspectives regarding capital punishment. The fact that the state charges a defendant with a capital crime should not cause it to obtain a jury more prone to convict than if it had charged the defendant with a noncapital offense.

> One commentator has noted:
> Underlying the Fifth Circuit's concerns may be the suspicion that "automatic life imprisonment" jurors may really be "automatic acquittal" jurors, although they swear at voir dire that they are not. However, any such suspicion could not alone justify the exclusion of these jurors consistent with the explicit holding of *Witherspoon* and *Adams* [*v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980),] that the factual basis for a venireperson's exclusion on account of death penalty attitudes must be "unmistakably clear." * * * Moreover, if death penalty opponents constitute a cognizable class for sixth amendment cross-section purposes, * * * the exclusion of these jurors based on such suspicion would also violate the *Taylor-Duren* prohibition of the use of rough rules of thumb in the jury selection context.
> Indeed, if the Fifth Circuit's view is correct, prosecutors presumably should be able to interrogate venirepersons in noncapital cases (assuming that their prosecution proneness would apply there as well) concerning their view on the death penalty, and remove for cause those who could never impose it. Nowhere, however, is this allowed. Haney, *Juries and the Death Penalty: Readdressing the* Witherspoon *Question*, 26 Crime & Delinquency 512, 514 (1980) (The process of "death qualification" is "unique to capital cases. In no other instance are prospective jurors systematically queried about their attitudes toward a particular legal punishment and then excluded, as a matter of law, depending on how they answer.")
> Winick, *Prosecutorial Peremptory Challenge Practices in Capital Cases: An Empirical Study and a Constitutional Analysis*, 81 Mich.L.Rev. 1, 59 n. 199 (1982).

ty is excluded by systematically challenging them for cause. As the district court noted, the petitioners were not seeking a jury composed entirely of WEs; what petitioners sought was a "jury drawn from the entire cross section of the community as a whole, including both those who strongly favored the death penalty and those who strongly opposed it." *Grigsby*, 569 F.Supp. at 1311.[32]

Judge James McMillan, one of America's most distinguished trial judges, observed in the district court opinion in *Keeten:*

> Common sense suggests that people who favor the death penalty are more likely to convict defendants charged with capital crimes, and that people who do not favor the death penalty are less likely to convict defendants charged with capital crimes. The Supreme Court recognized those contentions in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), but prudently did not then adopt them as a basis for decision because of the lack of sociological testimony, juror opinion polls and other evidence.

> Such evidence has now been developed and occupies hundreds of pages of the record of these cases.

*   *   *   *   *   *

A fair jury has not been provided when the prosecutor is able to keep on the jury those persons most likely to convict and to exclude from the jury for cause all those persons most likely to acquit.

Nor does a jury so constituted represent, even in theory, a representative cross-section of the community.

*Keeten*, 578 F.Supp. at 1167.

## V.

■ One last point urged by the state is that McCree should not succeed because there is no showing of actual prejudice. In a sixth amendment claim prejudice is not an element of proof. *See, e.g., Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *Ballew v. Georgia*, 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978); *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972). The underrepresentation of a distinct group from a petit jury brought about by systematic challenge for cause affects the integrity of the entire jury system and no actual prejudice need be shown.

The district court recommended a bifurcated trial with two juries. In a subsequent opinion the Arkansas Supreme Court found this to be impractical and the worst of all solutions. *Rector v. State*, 280 Ark. 385, 396, 659 S.W.2d 168, 173 (1983).[33] We

---

**32.** Professor Winick commented on the Fifth Circuit's argument against a cross-representational jury at the guilt-innocence phase of a capital trial:

> The Fifth Circuit has raised a more fundamental objection to inclusion of [WEs] even in a bifurcated trial system. In its view, a jury that included this group, rather than being neutral, might be biased in favor of the defendant, and therefore deny to the state its right to an impartial jury. This conclusion appears inconsistent with *Witherspoon's* central holding that exclusion of "oppose death penalty" jurors results in an unconstitutionally death-prone jury. As applied to *Witherspoon's* facts, the Fifth Circuit approach would presumably call for affirmance of Witherspoon's death sentence on the basis that juries including "oppose death penalty" jurors are more life imprisonment-prone than death-qualified juries, and therefore biased in favor of the defendant. But *Witherspoon* explicitly rejected this contention in favor of a jury that the Court deemed more impartial than one which excludes all death penalty objectors. *Witherspoon* thus suggests that if a capital jury resembling the jury that sits in the typical noncapital case—universally regarded as fair and impartial—is found to be significantly less conviction-prone than a death-qualified jury, then the latter would be constitutionally suspect as a trier of the defendant's guilt.

Winick, *Prosecutorial Peremptory Challenge Practices in Capital Cases: An Empirical Study and a Constitutional Analysis*, 81 Mich.L.Rev. 1, 59–60 (1982).

**33.** The Arkansas Supreme Court was quite critical of the district court's decision. However, the *Rector* opinion fails to discuss the sixth amendment issue we decide today. 280 Ark. at

think the procedure to be followed to secure an impartial jury in the guilt-innocence phase of a trial should be left to the states. In this regard, we modify the district court's requirement that the state utilize separate juries in a bifurcated trial. Other alternatives are apparent: selecting enough alternate jurors at the outset to replace WEs at the penalty phase; shifting the sentencing duty to the judge; or using an advisory jury at the penalty phase which need not be unanimous in its recommendation. We have no doubt that, when put to the challenge, the state will be able to construct a fair process which guarantees each defendant's sixth amendment rights.

Since Arkansas already has a bifurcated trial in capital cases perhaps the best possible procedure, rather than have two separate juries, would be to add to the number of alternates who sit in the guilt phase of trial. If the defendant is convicted a new *voir dire* could take place and the same jury could be qualified, with WEs excluded, to hear the penalty phase of the trial. As another alternative the WEs could be identified at the initial *voir dire* and a sufficient number of alternates retained to take their place on the sentencing jury. We note, however, the California Supreme

Court has concluded this form of *voir dire* tends to bias the jury. *Hovey,* 28 Cal.3d at 70–73, 616 P.2d at 1347–50, 168 Cal.Rptr. at 174–77. We need not pass upon that issue at this time. Neither procedure should significantly affect the cost or efficiency of the trial.

We therefore modify the district court's direction, to the extent it mandated a bifurcated trial with two juries, but otherwise find the writ should be issued unless the state begins proceedings to re-try McCree within such reasonable time as the district court may fix.[34] Judgment affirmed as modified.[35]

JOHN R. GIBSON, Circuit Judge, with whom ROSS, FAGG and BOWMAN, Circuit Judges, join, dissenting.

The court today concludes that a defendant's sixth amendment right to have a jury that reflects a representational cross-section of the community is violated when at voir dire those persons who would refuse to consider capital punishment are excluded for cause. The case before us essentially involves the refusal of such jurors to follow Arkansas law and consider the full range of penalties it provides, specifically the death penalty.[1] As the sixth amend-

393, 659 S.W.2d at 172. But see the concurrence of Justice Purtle, 280 Ark. at 400–01, 659 S.W.2d at 175–76, which is consistent with our opinion in the present case.

**34.** We note that if the state of Arkansas decides to re-try petitioner McCree it cannot seek the death penalty. *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981). Therefore, the jury in any retrial will not be death qualified at *voir dire.* Instead, McCree's guilt or innocence will be determined by a normal criminal jury drawn from a representative cross-section of the community. Under today's holding, this is what McCree would have been entitled to at his original trial on the guilt-innocence issue.

In its brief, the state has raised a concern about the possible retroactive application of our decision. There is no reason to decide that issue on the facts of the case before us. We decline to speculate as to the proper resolution of that issue and believe that *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), will prevent most prisoners from raising it.

**35.** We do not believe, and the dissenting opinion's final footnote does not argue, that *Wainwright v. Witt,* —— U.S. ——, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), requires a different result. *Witt* simply elaborates the meaning of the *Witherspoon* standard. It describes further the criteria for deciding whether a juror's opinions justify exclusion. It is not addressed to the separate problems addressed here: (1) whether a jury, once WEs are excluded, is conviction prone and therefore not impartial *on the issue of guilt or innocence;* and (2) whether a death qualified jury meets the cross-sectional representation requirement of the sixth amendment. Some of the footnotes, at least in the dissenting opinion of Justice Brennan, do discuss these questions, but we do not read them as deciding it one way or the other.

**1.** In McCree's case, the live controversy before us, the voir dire of the jury panel included the following questioning:

THE COURT: Now, ladies and gentlemen, as I read to you earlier, the charge in this case. I also read to you the penalty. The possible penalties are death by electrocution or life

ment does not require the representation of such jurors, I respectfully dissent.

## I.

At the outset, I note that decisions of the Supreme Court have found only a sixth amendment right to have a jury *selected from* a representational cross-section. The court today goes to extreme lengths to hold that the cross-sectional requirement applies to petit juries as well as to venires or panels. The court recognizes that *Duren* and *Taylor* prohibit only exclusion of cognizable classes from jury wheels, panels, or venires. *E.g., Taylor,* 419 U.S. at 538, 95 S.Ct. at 702 ("no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population"). Thus, it must argue that "there is no functional difference" between exclusion from the various jury groups and that *Duren* and *Taylor* "implicitly" forbid exclusion from the actual jury. *Supra* at 230. Two functional differences, however, exist. Peremptory challenges are made, not to members of the jury panel, but to persons who otherwise would become actual petit jurors, and petit jurors alone must swear to view the trial fairly and impartially and to render a ver-

dict in accordance with the law of the case. Further, the court's conclusion conflicts with the law of this circuit as stated in *Pope v. United States,* 372 F.2d 710 (8th Cir.1967), *vacated on other grounds,* 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968). There Judge (now Justice) Blackmun discussed in detail the jury selection process and rejected an argument that the exclusion of persons opposed to the death penalty "served improperly to produce a panel which was something less than representative of the community." *Id.* at 725. The court concluded that the "point at which an accused is entitled to a fair cross-section of the community is when the names are put in the box from which the panels are drawn." *Id.* The court today thus blurs the distinction between jury panels and actual juries, in contravention of reality and legal precedent.

## II.

The court's decision in this case rests solely on its sixth amendment analysis. *See supra* at 228, 242.[2] The basic question, therefore, is whether persons who would refuse to consider or who have inflexible scruples against capital punishment (*Witherspoon* excludables or WEs)

---

imprisonment without parole. Now are there any of you who would refuse under any circumstances to consider all of the penalties that are provided by law?

    \*    \*    \*    \*    \*

JUROR McDONALD: I'm Deloyse McDonald. It would violate my conscience to issue a death penalty.

THE COURT: If you were selected to serve on this jury would you refuse under any circumstances?

JUROR McDONALD: Yes, sir.

THE COURT: To impose the death penalty

JUROR McDONALD: Yes.

The questioning and responses of other members of the jury panel were similar to this exchange.

2. Judge Eisele's holding was based on two constitutional defects: denial of a cross-section and creation of conviction prone juries. The majority opinion constructs a curious merger of these two concepts, holding that a death qualified jury is an invalid cross-section because it is conviction prone. *Supra* at 229.

Regardless of what constitutional principle the majority opinion is ultimately based upon,

the district court erred in finding that McCree was entitled to relief on the ground that death-qualified juries are conviction-prone. McCree failed to demonstrate "actual bias" on the part of the jurors that convicted him. *See Woodard v. Hutchins,* 464 U.S. 377, 104 S.Ct. 752, 754, 78 L.Ed.2d 541 (1984) (Rehnquist, J., concurring); *Smith v. Phillips,* 455 U.S. 209, 216–17, 102 S.Ct. 940, 945–46, 71 L.Ed.2d 78 (1982); *Dennis v. United States,* 339 U.S. 162, 167–68, 70 S.Ct. 519, 521–22, 94 L.Ed.2d 734 (1950).

A simple example shows the dangers of forsaking the "actual bias" requirement for reliance on hypothetical studies. The district court concluded the studies established that "one consistent and inevitable result of the death-qualification process is the disproportionate exclusion of blacks and women." 569 F.Supp. at 1283. The limited data in the record disproves this "inevitable" conclusion. Following voir dire, eight individuals (five men and three women) were struck for cause solely because of the *Witherspoon* inquiry. Based on the gender figures for the group (11 men and 13 women), women (23.1%) were excluded for their death scruples *half* as frequently as men (45.5%).

are a distinctive group underrepresented because of systematic exclusion. The court today finds that *"Witherspoon * * * is direct authority that the group of WEs excluded in this case is a distinctive group in the community,"* supra at 231, and cites no other authority for this conclusion. *Witherspoon,* however, was not a sixth amendment case, and, in fact, the trial in *Witherspoon* occurred before the decision in *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 494 (1968), which first held the sixth amendment guarantee of jury trial applicable to the states. To say, as the court does today, that the fundamental issue is whether "the evidence supports the district court's finding that a jury with WEs stricken for cause is a conviction-prone jury," *supra* at 232, is to leap over and summarily assume what is not true: that WEs are a distinctive group.

Cross-section analysis must start with *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Explaining that the "purpose of a jury is to guard against the exercise of arbitrary power," the Court held:

> This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool. * * * Restricting jury service to only special groups or *excluding identifiable segments playing major roles in the community* cannot be squared with the constitutional concept of jury trial.

*Id.* at 530, 95 S.Ct. at 698 (emphasis added). Such distinctive groups or cognizable classes have been said to include "econom-

ic, social, religious, racial, political and geographical groups of the community." *Thiel v. Southern Pacific Co.,* 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946) (daily wage-earners cognizable class).[3] Women comprise such a distinctive group. *Taylor,* 419 U.S. at 531, 95 S.Ct. at 698; *see Duren,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). Distinctions based on race or national origin clearly meet the *Taylor* standard. *See, e.g., Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); *Smith v. Texas,* 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940). Somewhat more problematical are classifications based on age, education, and type of work. *See, e.g., Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) (assumed young are cognizable group); *United States v. Potter,* 552 F.2d 901 (9th Cir.1977) (less educated not cognizable class); *Quadra v. Superior Court,* 378 F.Supp. 605 (N.D.Cal.1974) (blue-collar workers not cognizable).

The court today, however, enters uncharted waters when it recognizes attitudes or opinions as sufficient to create a distinctive group. Attitudes and opinions, unlike the characteristics that underlie recognized cross-sectional groups, may change rapidly, whimsically, and without objective manifestation.[4] The extreme reach of the court's opinion is reflected by this statement:

> If prospective jurors, who would take an oath to decide a case on the basis of the

---

**3.** *Thiel,* in fact, represents a high-water mark for the Court's recognition of such possible cognizable classes. In recent years, the Supreme Court has looked primarily to race and sex to find distinctive groups. Further, since the civil suit in *Thiel* involved the Court's supervisory power over the administration of justice in the federal courts, 328 U.S. at 225, 66 S.Ct. at 988, consideration of the principles of comity and the deference owed to a state's criminal justice system did not arise. Regardless of the weight to be given *Thiel,* even broadly interpreted it would not encompass attitudinal classes.

**4.** Insofar as *Witherspoon* does afford authority for recognition of WEs as a distinctive group,

we observe that Justice Stewart's opinion came to the conclusion that "in a nation less than half of whose people believe in the death penalty, a jury composed exclusively of such people cannot speak for the community." 391 U.S. at 520, 88 S.Ct. at 1776. Justice Stewart observed that in 1966 47% of the American public were opposed to capital punishment, while 42% were in favor and 11% were undecided. *Id.* Time has caused a shift in these attitudes, however. *See* Vidmar & Ellsworth, *Public Opinion and the Death Penalty,* 26 Stan.L.Rev., 1245, 1249 (1974). The public support for the death penalty was 51% in 1969 and 59% by 1973. *Id.* Figures in the November 1982 Gallup Report show 72% in favor of the penalty. Thus, there is a question

law and facts presented, could be excluded for cause because they were white or black, or, based on questions elicited on *voir dire*, because they were pro-ERA, pro-life, Republicans or Democrats, such a systematic exclusion from the panel, would encroach upon a party's sixth amendment right to have a cross-sectional jury.

*Supra* at 230. The court could not make this statement unless it believed that the opinions and attitudes it itemizes are sufficient to create cognizable classes. However, while individuals may be classified according to their expressed attitudes, the constitutional issue is whether such classification is durable enough and objective enough to create a recognizable group. If a jury panel were questioned closely enough, a great many additional classes might emerge. It would be absurd, however, to suggest that the sixth amendment would prevent the exclusion for cause of each such class.[5]

The reasoning of the Supreme Court of California is most persuasive in this regard:

> Persons who would not be willing to vote for the death penalty come from diverse backgrounds and experiences, and may have diverse views on all other matters. Their unwillingness to vote for death may come from many sources: religious conviction, political alignment, moral philosophy, refusal to take such an awesome responsibility, or simply a feeling that "I just couldn't live with it." They do not comprise a distinctive, self-conscious group; one's identity is defined in part by his or her gender, race, religion, and other matters, but not generally by one's views on the single question of whether one would vote against death if chosen as a juror in a capital case. We conclude that the class of persons united only by their determination to vote automatically against the death penalty—a class divided in all else, including even their reasons for refusing to consider the death penalty—is not a cognizable class * * *.

*People v. Fields,* 35 Cal.3d 329, 349, 673 P.2d 680, 692, 197 Cal.Rptr. 803, 815 (1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 267, 83 L.Ed.2d 204 (1984).

The efforts of other circuits to define cognizability reveal similar concerns. In *United States v. Potter,* 552 F.2d 901, 904 (9th Cir.1977), the Ninth Circuit held that cognizability requires "an identifiable group, which in some objectively discernible and significant way, is distinct from the rest of society, and whose interest cannot be adequately represented by other members of the * * * panel" and "some internal cohesion." *Potter* also looked to "whether a particular class is in fact thought of as an identifiable group by the community." *Id.* at 904–05. In *United States v. Test,* 550 F.2d 577, 591 (10th Cir.1976), the Tenth Circuit defined cognizability as: "(1) the presence of some quality or attribute which 'defines and limits' the group; (2) a cohesiveness of 'attitudes or ideas or experience' which distinguishes the group from the general social milieu; and (3) a 'community of interest' which may not be represented by other segments of society." *Potter* and *Test,* unlike the court today, require a cohesive group rec-

---

concerning the validity of an assumption underlying the *Witherspoon* analysis.

Further, we also observe that there was evidence before the district court of the volatility and emphemeral nature of such attitudes. Dr. Gerald Shure testified that classifications can shift during a series of questions and some jurors can change their attitudes during the trial. The number of WEs has evidently varied from 23% of the population to 11–17% of the jury eligible population.

**5.** For example, in McCree's case, those who knew either the defendant or the victim, those who were victims of crime, and those who had relatives involved in police work were identified, and, since each such group had some predisposition toward the case that justified disqualification, were removed for cause. The logical conclusion from the court's action today is that such groups of jurors may in the future become the subjects of empirical studies as to their attitudes and subsequently be found to compose cognizable groups that cannot be so excluded for cause. The folly of such an outcome is obvious.

ognized by and distinguished from society in general. A group of jurors who during voir dire examination in a criminal case express a particular attitude as to capital punishment does not meet this test. A distinctive group should have some recognition, some characteristic outside the narrow confines of the courtroom. Thus, as a matter of law I reject the conclusion that the presence of attitudes concerning the death penalty can create a cognizable class.

### III.

McCree is not entitled to relief even if it is assumed that the majority is correct in holding that *Witherspoon* excludables are a cognizable group. Arkansas has significant interests that are "manifestly and primarily advanced" by its death-qualification process. *Duren,* 439 U.S. at 367–68, 99 S.Ct. at 670–71.

Arkansas currently utilizes a bifurcated scheme, in which a single jury sits at the guilt and sentencing stages. Georgia's use of a similar system was approved by the Supreme Court in *Gregg v. Georgia,* 428 U.S. 153, 162–68, 96 S.Ct. 2909, 2920–23, 49 L.Ed.2d 859 (1976). Jurors who refuse to consider imposing the death penalty are properly excluded from the sentencing phase. *See Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980); *Lockett v. Ohio,* 438 U.S. 586, 596, 98 S.Ct. 2954, 2960, 57 L.Ed.2d 973 (1978). A representative jury does not include the "jurors who have explicitly indicated an inability to follow the law and instructions of the trial judge." *Id.* at 596–97, 98 S.Ct. at 2960–61. As the Supreme Court stated in *Adams,* states have a "legitimate interest in obtaining jurors who could follow their instructions and obey their oaths." 448 U.S. at 44, 100 S.Ct. at 2526. Capital jurors must be willing to recognize "that in certain circumstances death is an acceptable penalty," and the "State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oath." *Id.* at 46, 50, 100 S.Ct. at 2527, 2529. It was exactly such jurors who were excluded from McCree's jury. Arkansas may constitutionally exclude from capital-sentencing juries those who will not consider the full range of punishments. That such exclusions will incidentally remove some venire persons from the guilt phase of the trial does not vitiate the state interest in death-qualifying juries for sentencing.

Thus, the issue narrows to whether the state has an interest in maintaining the single-jury bifurcated system. The Arkansas legislature and supreme court have approved the use of a single jury in capital cases. *See Rector v. State,* 280 Ark. 385, 393–98, 659 S.W.2d 168, 172–74 (1983), *cert. denied,* ── U.S. ──, 104 S.Ct. 2370, 80 L.Ed.2d 842 (1984). The state has an interest in seeing that the same persons who decide guilt fix punishment. As the Arkansas Supreme Court has observed:

> A jury system that has served its purpose admirably throughout the nation's history ought not to be twisted out of shape * * *. It has always been the law in Arkansas, except when punishment is mandatory, that the same jurors who have the responsibility for determining guilt or innocence must also shoulder the burden of fixing the punishment. That is as it should be, for the two questions are necessarily interwoven.

*Rector,* 280 Ark. at 395, 659 S.W.2d at 173. Placing the moral responsibility on the same group of jurors to decide both guilt and punishment is justified by the most significant policy considerations. When one jury hears both phases of the case, the jurors that comprise it cannot evade the heavy responsibility placed upon them of whether a convicted person should receive the death penalty. The court today would seem to require the replacement of some members of the guilt-phase jury with death-qualified jurors for the purpose of considering the death penalty. This division of responsibility between the two groups, even if only a few are replaced, would dilute accountability and disadvantage the accused.

Further, as several courts have observed, jurors who decide both guilt and penalty

are likely to form residual doubts or "whimsical" doubts, *Balkcom,* 578 F.2d at 496, about the evidence so as to bend them to decide against the death penalty. Such residual doubt has been recognized as an extremely effective argument for defendants in capital cases. To divide the responsibility, as the court's decision today would require, to some degree would eliminate the influence of such doubts.

Some courts have suggested that the state has an interest in assuring that *Witherspoon* excludables do not act as nullifiers in the guilt determination. *See Keeten,* 742 F.2d at 133; *Spinkellink,* 578 F.2d at 595; *Rector,* 280 Ark. at 397, 659 S.W.2d at 174; *cf. Adams v. Texas,* 448 U.S. at 46, 100 S.Ct. at 2526 (jurors must be willing to answer certain questions without "conscious distortion or bias" whose affirmative answers would lead to imposition of death penalty by the court).[6] This risk is acute here because Arkansas requires unanimous verdicts in capital cases. *See Grigsby v. Mabry,* 637 F.2d at 530 (Floyd R. Gibson, J., dissenting). Thus, the state's interests justify the removal of *Witherspoon* excludables from the guilt phase.

As the Supreme Court has made clear several times, it is "unwilling to say that there is any one right way for a State to set up its capital-sentencing scheme." *Spaziano v. Florida,* —— U.S. ——, 104 S.Ct. 3154 at 3165, 82 L.Ed.2d 340 (1984); *cf. Gregg v. Georgia,* 428 U.S. at 186–87, 96 S.Ct. at 2931–32 (judgments concerning capital punishment schemes should be tempered with considerations of federalism and the states' ability to judge the desirability of the death penalty as a sanction). The state interests asserted are sufficient grounds to uphold the Arkansas capital punishment structure.

## IV.

The court, stating that the question is "whether an impartial jury can exist when a distinct group in the community is excluded by systematically challenging them for cause," further characterizes the issue as whether an impartial jury can be present without a "jury drawn from the entire cross section of the community as a whole, including both those who strongly favor the death penalty and those who strongly oppose it." *Supra* at 242 (quoting *Grigsby,* 569 F.Supp. at 1311). It approves the statement of the district court in *Keeten* that "[a] fair jury has not been provided when the prosecutor is able to keep on the jury those persons most likely to convict and to exclude from the jury for cause all those persons most likely to acquit." 578 F.Supp. at 1167. The court thus apparently holds that impartiality under the sixth amendment requires a balancing on the jury as a whole of the juror attitudes regarding the death penalty.

The court's first error in this analysis lies in assuming that partiality as a *legal* concept is proven when *factually* it can be shown that juries with WEs removed are more conviction-prone. Even if we assume that the latter proposition is correct,[7] the court still fails "to bridge the gap of proof

---

**6.** The Harris 1971 study discovered that 56% of *Witherspoon* excludables would not vote to convict a person that they believed guilty, even if they could also vote "no" in the sentencing stage to prevent imposition of the death penalty.

**7.** We will not enter into a detailed analysis of the various studies relied upon by the district court and the court today. It is enough to generally observe that an empirical study, no matter how carefully conducted, simply cannot duplicate accurately the proceedings in a courtroom under which a jury is selected and sworn to try the issues in a criminal case. The responsibilities placed on jurors in such circumstances are sobering and have a solemn impact upon them. In this situation, one's responsibility is felt keenly. "There is a certain danger in relying on academic work, designed to promote inquiry and further research, as a basis for deciding disputes in a court of law—especially where the stakes involved are high and the implications for society are great." Baldus & Cole, *A Comparison of the Work of Thorsten Sellin and Isaac Ehrlich on the Deterrent Effect of Capital Punishment,* 85 Yale L.J. 170, 186 (1975); *cf.* Tanke & Tanke, *Getting Off a Slippery Slope,* 34 Am.Psychology 1130, 1138 (1979) ("Few persons, social scientists included, would be content to have fundamental constitutional liberties turn on the results of the latest experimental study.").

between the abstract proposition that death-qualified jurors are conviction prone and the contention that the jury which convicted him was in fact less than neutral with respect to guilt." *Balkcom*, 660 F.2d at 580 n. 17.

> "That a death-qualified jury is more likely to convict than a nondeath-qualified jury does not demonstrate which jury is impartial. It indicates only that a death-qualified jury might favor the prosecution and that a nondeath-qualified jury might favor the defendant." * * * Although the new studies may give us an external, ascertainable standard for determining death-qualified jurors' tendency to convict, they do not give us a standard for measuring impartiality *per se*. Moreover, we cannot expect to achieve the abstract concept of impartiality if it be equated with absence of tendency.

*Id.* at 578 (quoting *Spinkellink*, 578 F.2d at 594) & n. 13.

To understand legal impartiality we may look either to the individual jurors or to the jury as a whole. If we look to the former, it is obvious that all jurors undoubtedly come to their task with a number of attitudes, opinions, and "biases" that may bear on the way they will view the trial. The crucial question is whether such views prevent them from taking and following their oath to consider and decide the facts impartially and conscientiously apply the law as charged by the court. As was recently held in *Balkcom:*

> [U]nalterable opposition to the death penalty is a legitimate disqualification and * * * the exclusion of such disqualified jurors does not violate the fair cross-section principle of the sixth amendment. The fair cross-section must, in the end, be fair. Neither the state nor the defendant is entitled to an unfair juror whose interests, biases or prejudices will determine his or her resolution of the issues regardless of the law and regardless of the facts. A cross-section of the fair and impartial is more desirable than

a fair cross-section of the prejudiced and biased.

660 F.2d at 583.

If we look to the jury as a whole, the court today may be urging that we view impartiality "as a middle ground that involves a jury with persons who are in effect defendant prone." *Id.* But if defendant-prone individuals are added to an impartial jury, then the scales of justice have been tilted in favor of the accused. Yet the state as well as the accused enjoys a right to an impartial jury. As *Balkcom* points out:

> The guarantee of impartiality cannot mean that the state has a right to present its case to the jury *most* likely to return a verdict of guilt, nor can it mean that the accused has a right to present his case to the jury *most* likely to acquit. But the converse is also true. The guarantee cannot mean that the state must present its case to the jury *least* likely to convict or impose the death penalty, nor that the defense must present its case to the jury *least* likely to find him innocent or vote for life imprisonment.

*Id.* at 579.

The only other interpretation of the court's position today is one that assumes that jurors come to their tasks with biases that cannot be overcome, that one can only attempt to balance such conflicting biases in seating a representative jury, and that removal of WEs, who are acquittal-prone, thus tilts the jury as a whole toward conviction. I am not prepared to say, however, that a juror who is not a WE must be regarded as so conviction-prone that his very presence on the jury creates impartiality unless counterbalanced. Ultimately, I believe this view of the jury strips of significance the sworn oath of impartiality that each juror takes. The comments of the late Judge Prettyman regarding this issue are entirely apposite:

> [O]ur own inquiry has brought to our attention another thesis in this area of the law. It is that persons who are not opposed to capital punishment are psychologically inclined against criminals

and therefore a jury composed of such persons is not an impartial jury. We understand that this thesis has not as yet received the sanction of any court. We cannot accept it. We examine it because this is a serious case, and if the thesis were tenable it might cause reversal. No proof is available, so far as we know, and we can imagine none, to indicate that, generally speaking, persons not opposed to capital punishment are so bent in their hostility to criminals as to be incapable of rendering impartial verdicts on the law and the evidence in a capital case. Being not opposed to capital punishment is not synonymous with favoring it. Individuals may indeed be so prejudiced in respect to serious crimes that they cannot be impartial arbiters, but that extreme is not indicated by mere lack of opposition to capital punishment. The two antipathies can readily coexist; contrariwise either can exist without the other; and, indeed, neither may exist in a person. It seems clear enough to us that a person or a group of persons may not be opposed to capital punishment and at the same time may have no particular bias against any one criminal or, indeed, against criminals as a class; people, it seems to us, may be completely without a controlling conviction one way or the other on either subject. We think the premise for the thesis has no substance. *Turberville v. United States*, 303 F.2d 411, 420–21 (D.C.Cir.), *cert. denied*, 370 U.S. 946, 82 S.Ct. 1596, 8 L.Ed.2d 813 (1962), *quoted in Spinkellink*, 578 F.2d at 595.

In *Witherspoon* terms, although a death qualified jury may be more prone to convict than a jury with *Witherspoon* excludables, such a jury need not be "less than neutral." 391 U.S. at 520 n. 18, 88 S.Ct. at 1776 n. 18. To date three different panels of circuit courts have unanimously concluded that as a matter of law *Witherspoon* exclusions do not fail to produce impartial juries. *Keeten*, 742 F.2d at 134; *Balkcom*, 660 F.2d at 578–79; *Spinkellink*, 578 F.2d at 593–96. The court today cites as precedent only the overruled district court opinion in *Keeten*. It starkly stands alone in its views as to partiality under the sixth amendment.

The court today declares that jurors who would refuse to follow the law in a capital case and consider the full range of penalties, including a sentence of death, are a distinctive group whose absence from a petit jury robs it of neutrality and impartiality.[8]  I cannot accept this conclusion.

---

**8.** The Supreme Court's recent decision in *Wainwright v. Witt*, — U.S. —, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), while not controlling in this case, sheds light on a number of issues today considered by the court.

First, *Witt* makes clear that the essential consideration is whether jurors will conscientiously perform their duties in accordance with their instructions and their oath.

[T]he quest is for jurors who will conscientiously apply the law and find the facts. That is what an "impartial" jury consists of, and we do not think, simply because a defendant is being tried for a capital crime, that he is entitled to a legal presumption or standard that allows jurors to be seated who quite likely will be biased in his favor.

— U.S. at —, 105 S.Ct. at 852. As I have argued, this is the proper, relevant consideration. *Supra* at 243, 247. Second, the Court's consideration of the *Witherspoon* standard as redefined in *Adams* indicates there is a serious question whether *Witherspoon* can support the recognition of WEs as a distinctive class.

Finally, Justice Brennan's dissent in *Witt* sets forth in some detail the "fair cross-section" arguments enumerated by the court today, including the conclusion of conviction-proneness, and cites numerous authorities relied upon by the court today, including the district court decisions in *Grigsby* and *Keeten*. The majority opinion in *Witt*, however, rejects these views. It observes that the dissent's "exegesis" of *Witherspoon* "is a latter-day version of a 'fair cross-section' theme barely adumbrated by that opinion," — U.S. at —, 105 S.Ct. at 852, and notes that the dissent's reasoning regarding the cross-sectional requirement "if carried to its logical conclusion would require that a juror be seated who frankly avowed that he could not and would not follow the judge's instructions on the law." *Id.*  In stating that the Court "adhere[s] to the essential balance struck by the *Witherspoon* decision * * * if not to the version of it presented by today's dissent," *id.*, such reasoning is rejected.

The language of Witt relevant here is the product of a footnote exchange between Justices Rehnquist and Brennan in an opinion which elsewhere deprecates the force of footnotes. — U.S. at —, 105 S.Ct. at 851. Nonetheless, the discussion in *Witt* gives substantial support to this dissent.

We should reverse the decision of the district court and order denial of the writ.