**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Joseph F. KENNEDY,
Defendant-Appellant.**

No. 13949.

Missouri Court of Appeals,
Southern District,
Division Three.

March 24, 1987.

William L. Webster, Atty. Gen., Carrie Francke, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

David Robards, Joplin, for defendant-appellant.

TIMOTHY D. O'LEARY, Special Judge.

Defendant, Joseph F. Kennedy, was jury-convicted of capital murder and sentenced to life imprisonment without eligibility for probation or parole for 50 years.

On appeal, Kennedy alleges that the trial court 1) erred in excluding from the jury panel those who expressed an inability, under any circumstance, to impose capital punishment, and, 2) violated its duty to remain impartial when, on two separate occasions, it interrupted the examination of witnesses by the defense to inject comments unfavorable to the defense. Affirmed.

The sufficiency of the evidence to support the conviction is not questioned on appeal. It suffices to say that Kennedy had known the victim, Charles Amussen, and his wife, Anna, for a period of five months during which time Kennedy had done work for them at their residence and, on one occasion, had helped Amussen unpack a number of guns and place them in Amussen's gun cabinet.

On November 25, 1983, at approximately 12:30 p.m., Kennedy met Ralph West at Jackie's Bar. After drinking beer and shooting pool, the two went to West's apartment and consumed more alcohol. Kennedy asked West to go with him to talk to some people. They left in Kennedy's car and arrived at the Cedar Lane Trailer Court and went to the Amussen trailer. Kennedy knocked on the Amussen front door. When Amussen opened the door, Kennedy pulled a gun and forced Amussen back into the house. Kennedy and West also entered the house at that time. Kennedy told West to get Amussen's guns. West did so. Kennedy then shot Amussen in the head. The wound was fatal. Kennedy then turned the gun on Mrs. Amussen, who was sitting nearby, and shot her. West then ran from the house as Mrs. Amussen was screaming. He heard a third shot and the screaming stopped. Five to ten minutes later, Kennedy came out of the Amussen home carrying the guns wrapped in a sheet and put them in his car.

At trial, Kennedy testified in his own defense and alleged that he had blacked out this particular day and had no memory of his actions between the hours of 10:00 a.m. and 6:00 p.m. This covered the entire period from the time he met West at the pool hall until after the killing. Kennedy further testified that he had an alcohol problem and had been drinking brandy and beer that day prior to the Amussen murder. The jury had the right to disbelieve Kennedy's theory, and evidently did.

On appeal, Kennedy argues that the trial court committed error in propounding questions to the jury panel concerning their ability to consider imposition of the death penalty and, thereafter, striking for cause those jurors who indicated that they would be unable, under any set of circumstances, to impose such a penalty.

Kennedy suggests that this court should follow the opinion in *Grigsby v. Mabry*, 758 F.2d 226 (8th Cir.1985). That

decision ruled that *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), left open the question of whether the exclusion of jurors who hold absolute scruples against the death penalty creates a "conviction prone" jury as to the guilt of a defendant in a capital case. The *Grigsby* court then concluded the exclusion of these jurors created a capital offense jury that was in fact "conviction prone" and therefore the jury did not constitute a cross-sectional representation of the community in violation of the Sixth Amendment.

Following the arguments in this case, the Supreme Court overruled the *Grigsby* case sub nom. *Lockhart v. McCree*, 476 U.S. ——, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). The specific question decided as framed by the court was, "Does the Constitution prohibit the removal for cause, prior to the guilt phase of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of the trial?"

In rejecting the Eighth Circuit ruling that "death qualification" violated McCree's right under the Sixth Amendment, the court observed that "we have never invoked the fair cross-section principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large." The court further explained that even if it were willing to extend the cross-section requirement to petit jurors, it would reject the Eighth Circuit ruling on the basis that shared attitudes do not make up a distinctive group in the community. The court reasoned that since the essence of a "fair cross-section claim is the systematic exclusion of a distinctive group in the community," the claim must fail. For this and other reasons stated, the court ruled that "the Federal Constitution did not prohibit the removal for cause, prior to the guilt phase of the defendant's bifurcated capital trial, of prospective jurors whose opposition to the death penalty was so strong that it would have prevented or substantially impaired the performance of their duties as jurors at the sentencing phase of the trial...."

It is instructive to consider for a moment the history of the development of the law which directed trial courts how to pose the appropriate voir dire question.

For years, the courts of this country drew the standard for determining when a juror may properly be excluded from *Witherspoon*, supra, 391 U.S. at 522, fn. 21, 88 S.Ct. at 1777, fn. 21 which required:

> [Jurors may be excluded for cause if they make it] unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.* [Emphasis original.]

Later cases demonstrated that the courts did not require ritualistic adherence to this format but that there could be some deviation from the *Witherspoon* directive. In *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the court did not refer to the "automatic" language used in *Witherspoon*, but stated that each of the excluded veniremen in *Lockett* had made it "unmistakably clear" that "they could not be trusted to abide by existing law" and "to follow conscientiously the instruction" of the judge.

Next, in *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the court concluded that a juror may not be challenged for cause based on his views about capital punishment "unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."

After that decision, the Supreme Court again examined the procedure for selection of jurors in capital cases in *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), in which case they reviewed the history of the cases beginning

with *Witherspoon* and simplified the standard test for qualification of a juror in a capital case.

In this case, the court clarified the *Witherspoon* decision and modified the test to hold that the state may exclude from capital sentencing juries those veniremen whose views would "prevent or substantially impair the performance of their duties in accordance with their instruction or their oaths."

It is interesting to note, as pointed out by Justice Brennan, that in every case involving a violation of the *Witherspoon* doctrine, only the defendant's death sentence, and not his conviction, was vacated.

The question left undecided by these decisions was addressed by the Eighth Circuit en banc in *Grigsby*, and in *Lockhart*. That issue was whether the exclusion of jurors who had scruples against the death penalty created a "conviction prone" jury as to the guilt of a defendant in a capital case.

Between the decision of *Grigsby* and *Lockhart*, our Supreme Court in *State v. Malone*, 694 S.W.2d 723 (Mo. banc 1985), cert. denied, —— U.S. ——, 106 S.Ct. 2292, 90 L.Ed.2d 733 (1986), and *State v. Nave*, 694 S.W.2d 729 (Mo. banc 1985), cert. denied, —— U.S. ——, 106 S.Ct. 1500, 89 L.Ed.2d 901 (1986), decided on the same day, ruled that they were not bound to follow *Grigsby*, and that they were not persuaded to disregard *Wainwright*.

As a result of *Lockhart*, the test for determining what jurors may be excluded from capital sentencing juries remains the same as it was enunciated in *Wainwright* and that is that the state may exclude those veniremen whose views would prevent or substantially impair the performance of their duties in accordance with their instruction and oath. The claim of error has no merit, and is denied.

The second contention of error has to do with the trial judge interrupting questioning of a witness by defense counsel on two separate occasions. The first interruption came during Kennedy's testimony on direct examination:

Q: .... Since this proceeding has started, ... have there been examinations about your mental condition?

A: .... Yes. The Court requested that I be sent to the institution at Fulton. I went there and spent 26 days, I believe, at Fulton with a complete battery of tests, examinations and interviews.

THE COURT: Excuse me sir. As I understood, the witness said he was there at the Court's request. Well, would you clarify that point, please. What does the record show?

Kennedy argues that this remark made it clear to the jury that the court was eager for the jury to know that it had no part in his mental defense and, from this display of eagerness, it was only logical for the jury to infer that the court did not believe in his mental defense.

The second interruption came during the testimony of defendant's mental expert, Dr. Lewis:

Q: I want to go back to the testing. What—on the MMPI, what determination did you make about Mr. Kennedy significant to this case?

A: Most significant to this case is the—

THE COURT: Excuse me, ma'am. What determination did you make from that test?

Kennedy argues that the court, by its conduct, chastised his witness and reprimanded her for not answering the questions specifically, and this suggested to the jury that this witness should not be believed because she was volunteering testimony for him and also that the court did not believe her testimony.

The standard for review we must use to determine if the trial court acted improperly is found in *State v. Puckett*, 611 S.W.2d 242, 244 (Mo.App.1980), which reads as follows:

[w]hether the trial court's conduct is such as to prejudice the minds of the jury against defendant thereby depriving defendant of a fair and impartial trial. Whether there was prejudice depends on the context and words in each case. The trial court must maintain a position of

absolute impartiality, avoid any conduct which might be construed as indicating a belief on the part of the judge as to the guilt of defendant and the court should not demonstrate hostility toward the defendant. (Citations omitted.)

A less abstract guideline for the role and conduct of a trial judge is set out in the ABA Standards Relating to the Administration of Criminal Justice at p. 163.

Given the mandate of neutrality, the role of the judge is not that of a mere functionary to preserve order and lend ceremonial dignity to the proceedings. As the central figure at the trial mantled with neutrality, it is the judge's responsibility to direct and guide the course of the trial in such manner as to give the jury fair opportunity in the opposing actions of the adversary parties to reach an impartial result on the issue of guilt. The teaching of the history of common law nations is that the trial judge, adhering to his neutral role, should possess, nevertheless, power to curb both adversaries in order that independent courts be maintained for the rational enforcement of the rights of free men. Provided that he acts judicially and with due regard for the rights of the defendant, the trial judge should be empowered to clarify obscurity in issues or evidence, prevent unnecessary delay, and promote the expeditious, fair and dignified course of the trial.

Using these guidelines in examining the two contentions of error, we find there is no merit to either contention.

■ As to the first interruption, it was not improper for the trial judge to ask the defense attorney to clarify Kennedy's answer. It would have been a simple matter for counsel to have done so. The answer that "The Court requested I be sent to the institution at Fulton" was not responsive to the question, was not true, and suggested to the jury that the court asked that Kennedy be examined. Certainly, this was an inaccuracy that reasonably may have been misleading or misinterpreted by the jury. The answer deserved clarification. Kennedy's argument that the trial judge's remark would logically cause the jury to infer that

he did not believe in Kennedy's mental defense is illusory and fanciful. There is no reasonable basis for that suggested thesis.

■ On the second interruption, the trial judge simply stated, "Excuse me, ma'am. What determination did you make from the test?"

To allege, as Kennedy does, that by making this statement the trial judge chastised the witness and suggested to the jury that the witness should not be believed because of her voluntary statements is imaginative and creative, but without substance.

This was a suitable and judicious way for the trial judge to gently suggest that the witness make her answer responsive to the question, which she had not done.

The ABA standards on the role of the trial judge are well thought out and well stated. It is beneficial to recite the published philosophy of the drafters, composed of a wide cross-section of the various segments of the criminal justice system, which is:

The trial judge has the responsibility for safeguarding both the rights of the accused and the interests of the public in the administration of criminal justice. The adversary nature of the proceedings does not relieve the trial judge of the obligation of raising on his own initiative, at all appropriate times and in an appropriate manner, matters which may significantly promote a just determination of the trial.

ABA Standards Relating to the Administration of Criminal Justice, at 167.

The remarks of the trial judge, on the two occasions complained of, were appropriate under the circumstances, and did not show, or even imply, any partiality on the part of the trial judge. The point is denied.

Judgment affirmed.

GREENE, P.J., and PARRISH, PINNELL, and HANNA, Special Judges, concur.