**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Tony KOONCE, Defendant-Appellant.**

**No. 51236.**

Missouri Court of Appeals,
Eastern District,
Division Five.

May 5, 1987.

Motion for Rehearing and/or Transfer
Denied June 2, 1987.

Application to Transfer Denied
July 14, 1987.

Henry Robertson, St. Louis, for defendant-appellant.

William L. Webster, Atty. Gen., Byrona J. Kincanon, Asst. Atty Gen., Jefferson City, for plaintiff-respondent.

SIMEONE, Senior Judge.

## I

Appellant, Tony Koonce was charged, tried by a jury, convicted and sentenced for two counts of forcible rape, forcible sodomy, and attempted forcible sodomy pursuant to §§ 566.030, 566.060, R.S.Mo.1986. He was sentenced by the court, as a persistent sexual offender to thirty years on each of the four counts to run consecutively without probation or parole. §§ 558.011, 558.018.2. He appeals. We affirm.

## II

On appellate review, we review the facts in the light most favorable to the state. In determining whether the state made a submissible case to withstand a motion for judgment of acquittal, the appellate court accepts as true all the evidence favorable to the state, including all favorable inferences therefrom. All evidence and inferences to the contrary are to be disregarded. *State v. Manning,* 612 S.W.2d 823, 825 (Mo.App.1981). Furthermore, the determination of the credibility of the witnesses is within the peculiar province of the jury. *State v. Williams,* 652 S.W.2d 102, 111 (Mo. banc 1983).

Viewing the evidence in the light most favorable to the state the jury could reasonably find the following.

The victim, Robin Triplett, a 19–year old woman met the appellant, Tony Koonce, on February 6, 1985 at Forest Park Community College during a typing class.

The events which give rise to this criminal case occurred on Friday, February 8, 1985. But the story begins two days earlier. Tandelaya Malcom Wiley, a relative of Robin's, was then a student at Forest Park Community College.

The prosecutrix, Robin Triplett was the principal witness for the state. She testified that on February 6, she went to the Forest Park Community College at about 6:00 p.m. to get her cousin from class, "because she had to take me home." Robin wanted to enroll in school. Appellant was in the typing classroom and Tandelaya introduced them. While in the classroom, appellant came over to her, engaged in some conversation, and asked her name and requested her telephone number. She told him that "we couldn't get anything going [but] we could be friends." After the parties went their separate ways, that evening appellant called her about 10:00 p.m. He told her about some books she could use and they spoke for about thirty minutes. He asked her to go out with him. She refused.

The next afternoon appellant called again. He desired her to come to his home and tried to get her "to go out with him."

He called later that evening three separate times. She told him she was "taking up nursing classes" and "was in the Army Reserves." In the last conversation she indicated that she was going to take a bus to the college the next morning. The next morning, Friday, appellant called and asked if he could take her to school. It was "drizzling" so she said "yes." He came to the house and picked her up. Appellant, however, drove to his residence, rather than the college. Robin realized he was going the wrong way and asked about it. Appellant replied he wanted her to meet his mother. They went to appellant's residence where he lived with his mother. They went in the apartment and he introduced her to his mother. He invited her upstairs to his bedroom. She sat on a stool and he showed her some books. She told him she had to get to school. He tried "to hug me" but she pushed his arms away. They left. He took her to the college to enroll. When they left the college, "Tony drove her." She first went to cash her government check. Appellant took her to "like a pawn shop" where he knew a man who would cash the check because Robin did not have an ID card. Then she went to get some shoe polish to polish her boots, and after she bought the polish, the two drove but in the car—she noticed that he was not taking her home. Again they went to appellant's house. When they arrived, appellant's mother was there. He went up the steps and told Robin to come too. But for the time being she stayed in the living room. Koonce again asked her to come upstairs. The mother said, "It's okay, baby. You can go up." She then went upstairs to appellant's room. She sat on a stool next to the bed. She was looking through some books. Appellant was rearranging his clothes. After he took a phone call and turned on music "real loud", "he came over and started trying to touch me and feel me and stuff." Robin told him "to stop." Then appellant "picked me up off the stool like and pushed me over to the bed and asked me if I thought I was tough or something." Then "he smashed my face down to the bed and started trying to pull

my pants off and he couldn't get them off because I had on some boots and when he stood up to pull his pants down, I tried to run and he caught me and said if I did it again, that he was going to try and put me to sleep." When he pulled his pants down he was wearing a condom. Again, she tried to run and she was screaming. "When he was holding me down ... he told me if I did it again, he was going to [not try] put me to sleep." He raped her. She "was crying"; he put "his hand over [her] mouth." After the rape, "he made me turn over and he tried to put his penis in my behind." After the rape, "he made me turn over" and attempted sodomy *per anum*. He called her a "slut and a tramp." After these occurrences he made her "wash up," in the bathroom. Appellant said, "he's been through all this before and he knows what he's doing. I'm not going to have any evidence on him." After Robin "washed up," he took her back to the room and said, "he was going to call some of his friends over to finish the job." He made three calls. When she returned from the bathroom, he took a picture of Robin. Then he forced her to commit fellatio. After that, "he raped me again." Robin testified that she did not consent. She "washed up" again and they went downstairs and left the residence. Appellant took her home. It was then about 1:30 p.m.

When she arrived at her home, Robin called Tandelaya, according to Tandelaya about 1:30 p.m. Taydelaya testified Robin was hysterical, upset and crying and told her "Tony raped me." Robin called her mother at work and told her what happened. Her father came, then the police— Officer Robert Nowicki and Officer Sandra Stevens—and later her mother. Tandelaya also came to Robin's house. While they were all there, appellant called on the phone, Robin's father answered and "cursed and threatened" appellant. Robin "talked" to Detective Sandra Stevens. Later Robin and Stevens went to appellant's residence and identified appellant. He was arrested.

Appellant complains about certain remarks made by the trial court during the trial. He contends that the trial judge prejudicially injected himself into the trial, thus depriving him of a fair trial. These episodes occurred during the lengthy cross-examination of Robin.

The prosecutrix was cross-examined persistently and extensively. Counsel attempted to impeach Robin with her deposition. He inquired about the events during the first time she went to appellant's room with him. He inquired whether she had said that appellant did not try to "hug her." He inquired whether Robin knew a certain man and if he were a homosexual. An objection was sustained. Counsel persisted to inquire about whether there was any "hugging" or "anything like that" on the occasion when Robin was in appellant's room.

Then the following occurred.

THE COURT: What was the testimony as you recall upon direct examination?

[Defense Counsel]: Can we approach the bench?

THE COURT: No, sir.

[Defense Counsel]: Then I will proceed with questioning, your Honor.

THE COURT: You will proceed with questioning?

[Defense Counsel]: Yes, your Honor.

THE COURT: No, sir, you will answer my question if you are able to do so. Do you recall what the witness said on direct examination on this point?

[Defense Counsel]: Yes, your Honor, I do.

THE COURT: And what was it?

[Defense Counsel]: I'm not a witness for the State I don't intend to answer that question.

THE COURT: Is that so?

[Defense Counsel]: Yes, your Honor.

THE COURT: Go to your next question.

[Defense Counsel]: Your Honor, I wish to approach the bench.

THE COURT: Proceed with your interrogation.

[Defense Counsel]: Your Honor, I'll make my motion concerning your ask-

ing these questions on the record and we will discuss it in chambers.

THE COURT: We will discuss it where I select, not where you select. You handle that counsel table and I'll try to work this end of the room.

Defense counsel continued cross-examination. He questioned her about her attempt to enroll at the college; about sitting on the stool in appellant's room; about sitting on her coat and purse when they were on the stool and about "any relationship between Tandelaya Malcom and ..." Objection was sustained. He inquired whether appellant ever said he "thought [Tandelaya] was a lesbian." Robin answered, "yes." The prosecutor sought to approach the bench. There was a discussion at the bench. The court asked the prosecutor whether he had the "slightest idea what the defense attorney is driving at?" The prosecutor replied that "at some point [there are] some allegations that Tandelaya is a lesbian. How that relates in this case I don't know." The court then asked defense counsel "what is the basis of this interrogation?" Counsel replied "bias or prejudice against this defendant." The court said "You'll have to do better than that." A recess was called. Counsel continued his lengthy cross-examination—again asking about the shoe polish, about a boyfriend, about the phone calls appellant made, about the times events occurred, about stoplights, about calling Tandelaya after Robin returned home after the rape, about how long she was at appellant's apartment, and about appellant calling people on the telephone during the incident; sometimes counsel interrupted the witness, several questions were objected to and sustained.

Then the second complained instance of the trial court's remarks occurred:

Q (By Defense Counsel) Can you tell me what you were doing that entire time?

A I told you. He raped me.

Q He was raping you for three and a half hours?

A No. He made me lay on the bed for a couple of minutes while he was calling people.

Q He was calling people on the phone while he was raping you?

A No.

THE COURT: Excuse me, just a minute. Now I know you don't do that intentionally, but I'm asking you to avoid the position in your question as if the witness had said a particular thing when in many of these cases, the witness is not saying these things. The witness at no time has told us at the moment of a rape occurrence that he was on the telephone. Now I'll ask you to be a little careful about that.

Q (By [Defense Counsel]): Thank you, your Honor.

Counsel continued to inquire. Counsel asked about whether "she" talked on the phone between the four "instances." She answered: "*he* talked on the phone after he raped me the first time." Several questions relating to time sequence were objected to and sustained. Then the third complained of interjection occurred:

THE COURT: [Counsel], now are you representing to the Court that you believe that is what the testimony has been?

[Defense Counsel:] I'm just trying to ascertain what her testimony is, your Honor.

THE COURT: If that is your response to me, that question will not be answered. Go to your next question.

A [By Defense Counsel]: I'm puzzled. Was all sexual activity over with when he talked on the telephone?

[Prosecutor]: Objection. That was asked and answered.

THE COURT: Sustained.

A [By Defense Counsel]: The picture taking session, did that occur before this sexual activity or after?

[Prosecutor]: Object to the form of the question as being non-specific as to the four separate acts that she testified to.

THE COURT: It has been asked and answered. Objection sustained.

Q [By Defense Counsel]: The picture that he took—when was that in relation to these particular sexual acts?

[Prosecutor]: Objection. It's been asked and answered.

THE COURT: It's exactly the same question, just different words and form that I just addressed myself to.

[Defense Counsel]: Are you saying I can't ask that question, your Honor?

THE COURT: I'm saying that we already covered that material. It's been asked and answered.

Cross-examination then continued and on some occasions the prosecutor objected to counsel misstating Robin's testimony which objections were sustained. The court admonished counsel to "avoid doing that."

In the testimony of Tandelaya Malcom Wiley, she reiterated how Robin and appellant met, and that appellant told her "she looked like she could handle anything."

Following the evidence, an instruction conference was held. The court in addressing defense counsel said that "as I understand it, you are preparing six instructions and I will probably refuse them ... They go to consent ... I have detailed instructions to be refused. We will mark them A, B, C, D, E, and I offered by the Defendant." The court then stated "A, B, C, D, [not E] respectively are the Defendant's versions of the verdict directors ... There is no evidence of consent in this case, so it is being refused...." The legal file, however, shows that offered instruction E was "given."

After instructions were given and arguments were made, the jury found appellant guilty on all four counts.

On January 31, 1986, after appellant's motion for new trial was overruled and defendant granted allocution, defendant

was sentenced to 30 years on each count to run consecutively.

Defendant appealed.

### III

■ The thrust of appellant's first point is that the trial court erred in refusing to give his offered instructions on the defense of mistake of a reasonable belief that Robin had consented to the sexual acts. He contends that the court's refusal to give MAI–CR 2d 2.37.1.2 and other offered instructions dealing with a defense of mistake as to consent was error because there was evidence that the prosecutrix voluntarily accompanied appellant to his bedroom on two occasions and spent several hours with him without making any resistance or outcry or attempt to escape thus showing that there was evidence that appellant mistakenly believed that she consented to the sex acts. Appellant offered Instruction E,[1] based on MAI–CR 2d 2.37.1.2 which would have informed the jury that if it found that defendant believed Robin consented or whether defendant acted recklessly[2] with regard to her consent, and if he believed she consented or had a reasonable doubt as to whether he was reckless as to consent then it must find defendant not guilty.

The court gave the MAI–CR 2d 20.02.1, the rape instruction without the fourth paragraph thereof relating to belief as to consent. The court refused to give the offered instructions as to a mistaken belief of consent because "there was no evidence of consent."

■ The burden of injecting the issue of mistaken belief of consent of the prosecutrix is upon the appellant. *State v. Williams*, 696 S.W.2d 809, 812 (Mo.App. 1985); *State v. Butler*, 665 S.W.2d 41, 45 (Mo.App.1984). Before such instructions

1. Offered Instruction E is marked "given" and stamped by the court in the legal file. At the instruction conference the Court expressly stated that it would refuse offered Instructions A, B, C and D, but E was not specifically refused. However, the court undoubtedly refused E and the legal file must be a clerical error.

2. Recklessly is defined in section 562.016.4, R.S.Mo. as "when he consciously disregards a

substantial and unjustifiable risk that ... a result will follow and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise ..." Rape and sodomy can be committed "recklessly." *State v. Dighera*, 617 S.W.2d 524, 533 (Mo.App. 1981)—that is done with an awareness of the risk and a conscious disregard of that risk.

are required to be given this special negative defense must be "supported by enough evidence arising during the whole case to raise a reasonable doubt of defendant's guilt." *State v. Stiers,* 610 S.W.2d 83, 84 (Mo.App.1980), quoted in *Williams,* 696 S.W.2d at 813. The defendant's burden is not met "by statements of the defense which self-serve, but nothing more." *Butler,* 665 S.W.2d at 45; *Williams,* 696 S.W.2d at 812.

The broad issue of mistaken belief of consent as to when an instruction of the special negative defense is to be given based upon MAI–CR 2.37.1.2 has been thoroughly and analytically discussed in *State v. Williams,* 696 S.W.2d 809 (Mo.App.1985). Expounding on *State v. Beishir,* 646 S.W.2d 74, 79 (Mo. banc 1983), the Western District held in *Williams* that "[t]he only sensible basis for an instruction upon mistaken belief as to consent and as to its being a viable special negative defense is if the belief is a reasonable belief." *Williams,* 696 S.W.2d at 813; *State v. Lint,* 657 S.W.2d 722, 727 (Mo.App.1983).

This view of the question of mistaken belief as to consent of a victim in rape cases has been the subject of numerous decisions in other jurisdictions. Usually the issue arises regarding a mistaken belief as to the age of the victim. See 65 Am. Jur.2d, *Rape,* § 36 (1972); Annot., 8 A.L. R.3d 1100; *see* Richardson, *Sexual Offenses Under the Proposed Criminal Code,* 38 Mo.L.Rev. 371, 388 (1973); *Cf. People v. Hernandez,* 61 Cal.2d 529, 39 Cal.Rptr. 361, 393 P.2d 673, 8 A.L.R.3d 1092 (1964). When the issue arises as to a mistaken belief of consent, it is axiomatic that such belief must be a reasonable and honest one. *United States v. Short,* 4 USCMA 437, 16 CMR 11 (1954)—American soldier "propositioning" a Japanese woman who could not speak English; *United States v. Carr,* 18 M.J. 297 (CMA 1984); *See* R.M. Perkins, *Criminal Law* 940 (2d ed. 1969).

■ The evidence in the case at bar does not require a mistaken belief of consent instruction. The court did not err in concluding that there was no evidence of con-

sent. The fact that Robin went to defendant's room, that she did so without resistance and spent some time with him does not amount to consent nor a reasonable and honest belief that she consented to the acts committed by appellant. Robin testified that she did not encourage the appellant or consent. She testified she tried to run away and that she was crying and screaming and that appellant put his hand over her mouth and told her that if she struggled again, "he was going to put [her] to sleep." The evidence does not support an inference of a reasonable and honest belief that she consented to the sexual acts.

Under the circumstances there was no error on the part of the trial court in refusing to give offered Instruction E or others relating to a mistaken belief of consent.

This point is denied.

## IV

In his second point, appellant contends the court erred in refusing to grant his motion for judgment of acquittal because there was insufficient, uncorroborated evidence to show that he subjected Robin to such force as to overcome reasonable resistance to prove forcible compulsion, and that her uncorroborated testimony was so inconsistent and inclusive as to require corroboration.

He argues that the only threat he uttered was that he would "try" to put her to sleep and that this was not a "threat of death, kidnapping, or 'serious physical injury' as that term is defined by section 556.-061(26)."

■ This issue was not raised in appellant's motion for new trial or in the motion for judgment of acquittal and therefore, this court's review is limited to "plain error" review. Rule 30.20. In order to invoke the plain error rule, there must be a sound, substantial showing of manifest injustice or that a miscarriage of justice has resulted. *State v. Williams,* 637 S.W.2d 839, 841 (Mo.App.1982); *State v. Vidauri,* 699 S.W.2d 46, 48 (Mo.App.1985).

Under § 566.030 (rape) and § 566.060 (sodomy) forcible compulsion is a key element. Forcible compulsion is defined in § 556.061(12) as either (a) physical force that overcomes reasonable resistance or (b) a threat that places a person in reasonable fear of death, serious physical injury or kidnapping. "Serious physical injury" as defined in § 556.061(26) means "physical injury that creates a substantial risk of death or that causes serious disfigurement or impairment of the function of any part of the body."

■ The evidence that appellant lifted her off a stool and smashed her face into the bed, that he told her that "he was going to to put [her] to sleep," that he smashed her face into his penis is sufficient substantial evidence to show that he subjected her to such force so as to overcome reasonable resistance. Appellant spoke twice about putting her "to sleep." The first time she said he would "try" and the second time he said he would.

■ Appellant argues that Robin "was an Army Reserve member who Tandelaya said "looked like she could handle anything." He relies upon *State v. Remley*, 237 S.W. 489 (Mo.1922), *State v. Gray*, 497 S.W.2d 545 (Mo.App.1973) and *Johnson v. State*, 118 So.2d 806 (Fla.App.1960). *Remley* is inapposite. There were no threats in *Remley*. The Supreme Court held that according to the prosecutrix's own admissions the evidence showed that she and the defendant met at a park by agreement, remained all night therein, and voluntarily gratified their lust, without even the semblance of rape being present. *Remley*, 237 S.W. at 491. The rule is well established in Missouri that one may be guilty of rape even though the woman offers no physical resistance if she submits through fear of personal violence. *State v. Gray*, 497 S.W.2d 545, 548 (Mo.App.1973) and cases cited therein; § 556.061(12)(a). The fact that a woman may be a member of an Army Reserve does not mean that she must use combat methods to resist to the utmost. Resistance never comes into play where a threat (constructive force) is employed. *State v. Neal*, 484 S.W.2d 270

(Mo.1972); *State v. Garrett*, 494 S.W.2d 336 (Mo.1973); *State v. Cunningham*, 100 Mo. 382, 12 S.W. 376, 378 (1889); Bishop, *Criminal Law* § 1125 (7th ed.); Mo. Bar Committee Comments on MAI, *Rape* at 6 (1974).

■ We conclude that there was evidence of a forcible rape because there was "forcible compulsion"—both physical force that overcomes reasonable resistance and a threat of "serious physical injury" as that term is defined.

Appellant contends that corroboration was necessary to satisfy the element of forcible compulsion because Robin's testimony was inconsistent and inconclusive.

■ Under the Criminal Code, corroboration of the testimony of a complaining witness in a rape or sodomy case is not mandated unless the victim's testimony is so contradictory and in conflict with the physical facts, surrounding circumstances and common experience so that the validity of such testimony is rendered doubtful. Barring gross inconsistencies and contradictions, a resolution of conflicts in the evidence and the determination of the credibility of the witness are matters for the jury to determine. *State v. Vidauri*, 699 S.W.2d 46, 48 (Mo.App.1985); *State v. Mazzeri*, 578 S.W.2d 355, 356 (Mo.App.1979)— "extremely doubtful"; *State v. Harris*, 620 S.W.2d 349, 353–354 (Mo. banc 1981).

In *State v. Baldwin*, 571 S.W.2d 236, 239 (Mo. banc 1978), our Supreme Court explained that a rape conviction may be had upon the uncorroborated evidence of the prosecutrix and that "[i]t is only those cases where the evidence of the prosecutrix is of a contradictory nature or, when applied to the admitted facts in the case, her testimony is not convincing and leaves the mind of the court clouded with doubts, that she must be corroborated or a judgment cannot be sustained." It is clear, however, that the rule in *Baldwin* is not applicable where "the inconsistency or even contradiction bears on a proof not essential to the case." *State v. Salkil*, 659 S.W.2d 330, 333 (Mo.App.1983). *See also State v. Johnson*, 595 S.W.2d 774, 776 (Mo.App.1980) (The

testimony of the victim is not considered to be "clouded with doubt" or "extremely doubtful" within the rule merely because she falls into inconsistencies or contradictions as to minor points of a nonessential nature).

■ Appellant urges that the testimony of Robin is inconsistent and contradictory in several respects: she told the police that appellant did not turn the radio up until after he forced her onto the bed, not before, and held her down by her shoulders while attempting to remove her undergarments with one hand and that penetration was achieved from the front or the back.

The testimony of Robin does not show that her testimony was so grossly inconsistent or contradictory so as to rise to the level of required corroboration. The testimony is not such that it clouds the jury with doubt or which makes the evidence "extremely doubtful." Any inconsistency in the evidence is a matter for the jury. *Harris*, 620 S.W.2d at 354, *quoting State v. Davis*, 497 S.W.2d 204, 207 (Mo.App.1973). Any inconsistencies do not rise to the level of plain error. This point is ruled against the appellant.

## V

For his third point, appellant contends that the trial court committed plain error in making comments to defense counsel during cross-examination of the prosecutrix because, he contends, the court intimated that counsel was misrepresenting her testimony, made impermissible comments on the evidence and deviated from his duty of judicial impartiality so that the court improperly conveyed to the jury its belief that the victim's testimony was consistent and accurate. In this regard appellant contends the court prejudiced him by "the hostility showed" to defense counsel.

Since appellant failed to preserve this point for review, we consider it under the doctrine of plain error. Rule 30.20.

Appellant contends that the comments of the court "so endorsed the credibility" of Robin that the court's comments amounted to "manifest injustice, a miscarriage of justice and [a] denial of the right to confront and cross-examine her." Appellant further contends that the "remarks" and "impatience" of the court constituted prejudicial error.

During the cross-examination of Robin, defense counsel attempted to impeach Robin as to many details as outlined above.

Counsel began asking questions about the appellant making derogatory remarks about her cousin, Taydelaya Malcom. A bench conference was held at which the court asked the prosecutor if he knew what the defense is "driving at." The prosecutor replied that "at some point along the line, some allegations that Tandelaya Malcom is a lesbian. How that relates in this case I don't know." Cross-examination was resumed. Counsel cross-examined about what Robin was doing the "entire time." She replied, "I told you. He raped me." "Q. He was raping you for three and a half hours? A. No. He made me lay on the bed for a couple of minutes while he was calling people. Q. He was calling people on the phone while he was raping you."

At that point the court interrupted.

On direct testimony, Robin testified as to the timing of the sexual acts. On direct, she testified that the order of events was that appellant first called on the phone, then took a picture of her and then sodomized her. On cross, she placed the events as the picture, the sodomy and then talking on the phone.

Appellant relies upon a number of decisions.[3]

---

3. Including, *State v. Wren*, 486 S.W.2d 447 (Mo. 1972)—court said that it would allow prosecutor to "develop this *ad nauseum*"; *State v. Lomack*, 570 S.W.2d 711 (Mo.App.1978)—comment on evidence; *State v. Castino*, 264 S.W.2d 372 (Mo. 1954); *State v. Tash*, 528 S.W.2d 775, 782 (Mo. App.1975)—brief questioning by court; no prejudicial error. *Cf. State .v. James*, 321 S.W.2d 698 (Mo.1959)—165 questions or 140 pages of transcript; *Clear v. Van Blarcum*, 241 S.W. 81 (Mo.App.1922)—comment on evidence; *State v. Hyde*, 136 S.W. 316, 333 (Mo.1911)—physician accused of poisoning patient; court said "this is as far as you can go with an honest witness" not reversible error.

The standard for review to determine if the trial judge acted improperly is stated in *State v. Puckett*, 611 S.W.2d 242, 244 (Mo. App.1980):

> [w]hether the trial court's conduct is such as to prejudice the minds of the jury against defendant thereby depriving defendant of a fair and impartial trial. Whether there was prejudice depends on the context and words in each case. The trial court must maintain a position of absolute impartiality, avoid any conduct which might be construed as indicating a belief on the part of the judge as to the guilt of defendant and the court should not demonstrate hostility toward the defendant. (Citations omitted.)

See also the guidelines for the conduct of a trial judge in the ABA Standards Relating to the Administration of Criminal Justice at 163, 167 and the excellent discussion in *State v. Kennedy*, 726 S.W.2d 884 (Mo. App.1987).

The well established rule in Missouri is that a fair trial exacts absolute impartiality by the judge. A judge must not say anything that can be construed by the jury to the prejudice of the defendant. *State v. Castino*, 264 S.W.2d 372, 375 (Mo. 1954). "Even if counsel or others should be guilty of misconduct the judicial calmness and the dignity and the self-restraint and obvious impartiality of the judge must always be maintained and made manifest...." *State v. Montgomery*, 363 Mo. 459, 251 S.W.2d 654 (1952)—threatened counsel, directing him to sit in chair improper. Our Supreme Court has stated:

> Under our system of jury trials, the judge before whom the trial is conducted has a deep responsibility for the orderly and dignified conduct of courtroom proceedings. When the issue is one which may imprison the defendant on trial in a criminal cause, the tension of the courtroom drama and the human frailties and emotional factors inevitably involved serve to make the judge's task more difficult. Order and decorum must be maintained. The factual inquiry must be conducted within the issues and at all times under the applicable rules of law ... The judge must not indicate a belief in either the guilt or innocence of the accused. Nor may he let such belief be reflected or even conjectured by the jury in his treatment of either counsel. We know that juries are inclined to draw conclusions and are quite sensitive to any indications of the judge's belief as to the merits of the issue being tried.

*Montgomery*, 251 S.W.2d at 657; *See also State v. Fields*, 314 S.W.2d 723, 725 (Mo.1958); *State v. Lomack*, 570 S.W.2d 711, 712–713 (Mo.App.1978).

This does not mean, however, that the judge may not correct counsel when necessary as long as it is not done in a contemptuous manner, *State v. Nevills*, 530 S.W.2d 52, 54 (Mo.App.1975), or may not summarize evidence in expressing a ruling. *State v. Fields*, 314 S.W.2d at 25; *State v. Ball*, 529 S.W.2d 901, 909 (Mo.App. 1975). The factors used to determine the propriety of any comment include whether it was volunteered by the trial judge, was not made in response to an objection as part of the court's ruling, was made in the presence of the jury, or could have been construed by the jury to prejudice the defendant. *State v. Mitchell*, 693 S.W.2d 155 (Mo.App.1985); *State v. Lomack*, 570 S.W.2d 711, 713 (Mo.App.1978); *State v. Ball*, 529 S.W.2d 901, 908 (Mo.App.1975). "The trial court has the authority and obligation to maintain the orderly conduct of the trial. Its rulings with respect to actions of counsel rest largely within a wide discretion accorded to the trial court." *State v. Reed*, 640 S.W.2d 188, 197 (Mo. App.1982).

There is reversible error only when so preserved if the conduct of the trial judge has so prejudiced the jury so as to deprive the defendant of a fair and impartial trial. *State v. Hill*, 518 S.W.2d 682, 685 (Mo.App.1975). The whole question of prejudice because of comments, questions or statements by a judge usually arises in one of these contexts: (1) a judge may comment so obviously as to indicate his opinion of guilt, or that a witness is honest or dishonest, thereby depriving defendant of a fair trial, (2) a judge may question a

witness to develop the truth more fully or to clarify a matter. This is proper if the questioning reveals no prejudice and (3) the judge may act to discipline or correct an attorney or witness in a non-prejudicial manner. In these various context, whether there is prejudicial error depends upon other elements. The judge is not to convey an attitude of hostility or bias against the defendant; the judge must not pursue truth in the manner of the prosecutor; the judge shall not engage in protracted examination, *State v. James, supra* and even then the judge might purge his conduct of the prejudice. *State v. Tash*, 528 S.W.2d at 783.

■ Having examined the entire record we find no prejudicial or plain error in this regard. The trial court showed great patience during the lengthy and tedious cross-examination by defense counsel. During the trial, defense counsel sought to approach the bench at least seven times; he was admonished at least five times; and the court permitted defense counsel more than reasonable leeway throughout his repetitious questions on the same point, through the labyrinth of details and often through counsel's mistatements of the testimony.

The three comments by the trial court which appellant complains about are not prejudicial and are not plain error. The trial court did not express an opinion as to the nature, content or truthfulness of the evidence. *State v. Barron*, 465 S.W.2d 523, 527 (Mo.1971). The first occurrence directed counsel not to misquote the testimony of the witness. There was no hostility in the statement nor does it express any belief as to the truth or veracity of the testimony. The statement was not prejudicial to the defendant. Under the circumstances, no prejudice resulted. *State v. Phelps*, 478 S.W.2d 304, 310 (Mo.1972).

When the court said:

Excuse me just a minute ... I'm asking you to avoid the position in your question as if the witness had said a particular thing when in many of these cases, the witness is not saying these things. The witness at no time has told us at the

moment of a rape occurrence that he was on the telephone. Now I'll ask you to be a little careful about that,

the statement was in the nature of an admonition to counsel and was within the court's discretion. *State v. Barron*, 465 S.W.2d 523 (Mo.1971). It did not express any belief as to the truth and veracity of the testimony, and did not show any hostile attitude. *State v. Phelps*, 478 S.W.2d 304, 310 (Mo.1972).

In the third instance, the state objected to a question and the objection was sustained. Counsel proceeded to ask the same question again. The judge interjected, asking defense counsel a question. Counsel asked the question in several different forms. The state's objections were sustained. The court's statement was not a comment on the evidence or on the credibility of the witness. *State v. Valentine*, 646 S.W.2d 729, 733 (Mo.1983).

■ We hold that the statements by the judge did not violate his judicial duty to remain impartial or endorse the credibility of Robin so as to rise to a level of prejudicial or plain error. The plain error rule is to be used sparingly. *State v. Sockel*, 490 S.W.2d 336, 339 (Mo.App.1973). It is invoked on a case by case basis, and there must be a sound, substantial manifestation, and a strong clear showing that injustice or a miscarriage of justice resulted. *State v. Meiers*, 412 S.W.2d 478, 480–481 (Mo.1967). We find no such plain error here.

## V

The fourth and last point raised by appellant is that the sentence of 30 years on each of four counts is excessive, disproportionate to the offenses charged, and cruel and unusual punishment. The appellant contends that the appellant did not commit an aggravated offense, and the sentences exceed those which are "meted out for a more brutal offense committed by someone with a far more extensive and vicious criminal record" with no allowance for the possibility of rehabilitation or mitigating circumstances.

The state alleged in the information in lieu of indictment that appellant was a persistent sexual offender, and the appellant stipulated that he had a prior conviction for rape. Section 558.018, R.S.Mo. provides that the court "shall" sentence a person who has been found guilty of rape, forcible rape, sodomy, forcible sodomy, or an attempt to commit such crimes to an extended term of imprisonment if it finds that the defendant is a "persistent sexual offender." A "persistent sexual offender" is one who "has been previously convicted of the felony of rape, forcible rape, sodomy, forcible sodomy or an attempt. Section 558.018.3 provides that the term of imprisonment for one found to be a "persistent sexual offender" "shall be not less than thirty years, which term shall be served without probation or parole." Then § 558.026, R.S.Mo. requires that multiple sentences of imprisonment imposed for rape, forcible rape, sodomy, forcible sodomy or an attempt "shall" run consecutively to the other sentences. This latter section has caused some confusion.

In *State v. Williams,* 700 S.W.2d 451 (Mo. banc 1985), the Supreme Court en banc held that the persistent sexual offender act is constitutional. Appellant does not contend here that the statute is unconstitutional but contends that the sentences are disproportionate to his offenses. The sentences, he says, "effectively life without parole, is the most extreme that can be meted out for these offenses."

Appellant relies principally on *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). In *Solem,* Helm was charged in South Dakota with uttering a no account check, "one of the most passive felonies a person could commit." He had six prior convictions for non-violent offenses and was sentenced to life imprisonment without parole. The Supreme Court of the United States noted that the principle that punishment is to be proportionate to the crime is deeply rooted in the common law, and when the Framers adopted the Eighth Amendment, they also adopted the principle of proportionality. *Solem,* 103 S.Ct. at 3008; *Weems v. United States,* 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910). Although reviewing courts should grant "substantial deference" to the broad authority that the legislature possesses in determining the types and limits of punishment, and to the discretion that the trial court possesses, the court must be guided by objective criteria. Those objective criteria include: (a) the gravity of the offense, (b) the sentence imposed on others in the same jurisdiction, and (c) the sentences imposed in other states. The court concluded that Helms' sentence was significantly disproportionate to his crime prohibited by the Eighth Amendment, and affirmed the Court of Appeals holding that habeas should be granted unless the state resentenced him.

In Missouri it has consistently been held that a punishment within the statutory limits established by the lawful representatives of the people is not cruel and unusual when the statute authorizing the punishment is not invalid, and when the punishment imposed is within the range prescribed by the legislature, it cannot be judged to be excessive by an appellate court. *State v. Repp,* 603 S.W.2d 569, 571 (Mo. banc 1980). Furthermore, when the defendant is convicted of separate offenses and the sentences imposed are within the statutory limits, the consecutive effect of the sentences does not constitute cruel and unusual punishment. *State v. Neal,* 514 S.W.2d 544, 549 (Mo. banc 1974); *Repp,* 603 S.W.2d at 571. The power to declare what shall constitute a crime and what shall be the punishment therefor is vested in the legislature. *State v. Raccagno,* 530 S.W.2d 699, 703 (Mo.1975).

In Missouri, a punishment within the statutory limits is not cruel and unusual unless it is so disproportionate so as to shock the moral sense of all reasonable men. *State v. Walker,* 618 S.W.2d 43, 44 (Mo.App.1981); *State v. Bailey,* 659 S.W.2d 559, 561 (Mo.App.1983).

In *State v. Brown*, 636 S.W.2d 929 (Mo. banc 1982), the issue of whether sentences of 65 years on two counts was cruel and unusual. Appellant was convicted of forcible rape and forcible sodomy, and having found to be a persistent offender was sentenced to a term of 65 years on each count to be served concurrently without probation or parole. Appellant attacked the sentence as being cruel and unusual. The court stated "[i]t is not for this court to specify punishments for the offenses involved." *Brown*, 636 S.W.2d at 937.

*Brown* was decided prior to *Solem*. *Solem* is distinguishable in that it deals with non-violent offenses. There was no mandatory statute. *Solem* does not deal with sentences imposed for sexual abuse. *Solem* does not require proportionality in every case in which it is requested. *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

Section 558.026.1, R.S.Mo. provides that "[m]ultiple sentences of imprisonment shall run concurrently; except that ... the sentence of imprisonment imposed for the felony of rape, forcible rape, sodomy, forcible sodomy or an attempt to commit any of the aforesaid shall run consecutively to the other sentences."

This section has been construed in several recent decisions. In *Adams v. State*, 688 S.W.2d 401 (Mo.App.1985), appellant pleaded guilty to forcible rape and sodomy and the court imposed consecutive sentences of ten and eight years to run consecutively. It was stipulated that the court would have made the sentences concurrent except for its interpretation of § 558.026.1. Appellant's sole point on appeal questioned whether § 558.026.1 mandates consecutive sentences for the offenses of rape and sodomy. This court held that this section "removes from the trial court the option of sentencing sex crimes concurrently." *Adams, supra*, 688 S.W.2d at 402. We said that formerly "§ 558.026.1 Laws 1977 effective January 1, 1979, provided that multiple sentences on any crime would run concurrently unless the court designated consecutive sentences. Section 558.026.1 was amended by Laws 1980 to its present form and indicates the legislative intent for consecutive sentences for the sex crimes expressly mentioned in this section." *Adams*, 688 S.W.2d at 403; *State v. Shaw*, 701 S.W.2d 514, 518 (Mo.App.1985)—concurrent sentences improper; *State v. Blockton*, 703 S.W.2d 500, 506 (Mo.App. 1985).

Section 558.018.3, R.S.Mo. mandates that the term of imprisonment for one found to be a "persistent sexual offender" shall be not less than thirty years, which term shall be served without probation or parole.

■■■ When a defendant is convicted of several sex offenses committed at the same time and is found to be a persistent sexual offender, section 558.026.1 requires that consecutive sentences be given for sex crimes when a rape or sodomy (or an attempt) is committed at the same time. *State v. Webb*, No. 37,736, Western District, April 7, 1987.

■■■ The attorney for appellant, at the beginning of the trial acknowledged as much. At the beginning of the trial a stipulation was made that appellant had previously been convicted of rape, and was a persistent sexual offender. Counsel also recognized that since the information in lieu of indictment, having charged appellant as being a persistent sexual offender, defendant "faces thirty years and life without parole on each of the [four] counts."

Under these statutory provisions, the trial court was mandated to follow the law as established by the General Assembly. The court having found appellant to be a "persistent sexual offender" sentenced the appellant to a term of 30 years on each count, to run consecutively. In such a situation, the contention of disproportionality is without merit.

## VI

We have read the entire transcript; we have reviewed the authorities relied upon

by the appellant and we find no prejudicial reversible error.

The judgment is affirmed.

SNYDER, C.J., and CARL R. GAERTNER, J. concur.